UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:20-cv-00098-LCB-LPA

| | |
|---|---|
| LAURA M. WALLS, Individually and as Executor of the Estate of ROBIE W. WALLS | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FORD MOTOR COMPANY, et al. | ) ) |
| Defendants. | ) |

## BRIEF IN RESPONSE AND IN OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE EVIDENCE OF OCCUPATIONAL OR BYSTANDER EXPOSURE TO ASBESTOS IN THE US NAVY AND TO EXCLUDE DEFENSE NAVAL RESEARCHERS

Defendant Eaton Corporation ("Eaton") respectfully submits this brief in response and in opposition to Plaintiff's Daubert Motion to Exclude Evidence of Occupational or Bystander Exposure to Asbestos in the US Navy and To Exclude Defense Naval Researchers [DE 264] and [DE 267].

### Introduction and Summary of Argument

### INTRODUCTION

In her *Daubert* Motion, Plaintiff seeks to exclude opinion testimony from defense experts, including Eaton's expert, Captain McCloskey[1]. Plaintiff argues that Captain

---

[1] Eaton incorporates herein the arguments of Strick Trailers, LLC directed in opposition and in response to [DE 264]. and [DE 267] that are not inconsistent with Eaton's position, including any arguments in opposition to Plaintiff's *Daubert* motion directed at Strick Trailers LLC's Expert, Captain McCloskey.

McCloskey should be precluded from testifying as she lacks personal knowledge as to Mr. Walls' exposure to asbestos while serving in the U.S. Navy and because she has no experience as an industrial hygienist. This Court should deny Plaintiff's motion as Captain McCloskey's opinions are both relevant and reliable—the two touchstones required of any *Daubert* analysis. Plaintiff's motion is merely a stealth attempt to change her burden in this case. Plaintiff seeks to exclude any testimony and evidence in this case that Mr. Walls' mesothelioma was caused by exposures to amphibole asbestos—which is a type of asbestos not used in automotive friction products allegedly at issue in this litigation, but rather was used in an abundance of products on U.S. Naval ships including the ships Mr. Walls served on during his military career from 1955 to 1959. Plaintiff even alleges in her complaint (and amended complaints) that:

> Plaintiff Robie W. Walls served in the United States Navy from 1955 to 1959 as a Torpedoman's Mate 3rd Class. The Plaintiff served onboard ships that were homeported, repaired and/or overhauled at ports including, but not limited to Newport, Rhode Island. The Plaintiff's duties included refurbishing torpedoes. As a result of Plaintiff's Naval service as set forth above, it is believed that Plaintiff was exposed to asbestos dust, fibers and/or particles without controls, warnings or protection."

[DE 1 at ¶ 41].

Furthermore, Mr. Walls' service in the United States military as a torpedoman for the Navy was ranked in the top 20 most at risk for asbestos-related disease.[2] Additionally, Mr. Walls' lymph node tissue digestion revealed the presence of a rare type of amphibole

---

[2] *See* [DE 267, Ex. 11], Letter from Chief, Bureau of Medicine and Surgery, Department of the Navy (9/12/78) with enclosure (3), list of rates potentially at risk of exposure. Torpedoman's Mate is 17 on the list of 20.

4829-2697-4452, v. 6

asbestos (anthophyllite), which Plaintiff's experts admit is more potent than chrysotile asbestos, and was used in fillers in certain paints.[3] In light of this, the Court should not permit the Plaintiff to exclude testimony and evidence as to Mr. Walls' naval career. Furthermore, Plaintiff's *Daubert* motion to exclude Eaton's expert (Capt. McCloskey) from discussing occupational or bystander exposure to asbestos in the U.S. Navy should be denied.

Captain McCloskey is a retired Navy Captain who will assist the jury in understanding: the various ships that Mr. Walls served on, discuss ship cruises, educate the jury on Navy ranks and ratings, describe for the jury what asbestos-containing products were on board of the ships Mr. Walls served on, and help the jury understand military standards, specifications, products and engineering documents. She is qualified and her testimony is relevant and reliable. Unlike the average juror, she has specialized knowledge, education, training and experience in ship construction, repair, ship propulsion and various systems (and equipment within such systems), and the historical use of asbestos-containing products and materials associated with such ship systems.

While Plaintiff has the burden of proof in this case, she conflates her burden of proof with the standard for admissibility of expert testimony related to exposure. She suggests that defendants are required to satisfy the *Lorhmann* test as to any suggestion of alternative exposure. *See* [DE 267 at p. 10] ("in order to implicate an exposure to amphibole asbestos as a cause of Mr. Walls' mesothelioma, a defense expert would have to place Mr. Walls

---

[3] *See* Dr. Bandli's report [DE 231-Ex. 4].

4829-2697-4452, v. 6

around specific amphibole-containing products and be able to testify that these products were disturbed in close proximity to Mr. Walls on a regular and frequent basis. (*citing Lohrmann v. Pittsburgh Corning Corp*, 782, F.2d 1156 (4th Cir. 1986) in footnote 47 of [DE 267])). Rather, in defense of a *Daubert* attack, defendants' only burden is to establish the reliability and the relevance of their Naval experts' testimony. *See e.g. Pugh v. Louisville Ladder, Inc.* 361 F. App'x 448, 452-53 (4th Cir. 2010) (rejecting a requirement that a party seeking to offer an expert need not prove anything but "come forward with evidence from which the court can determine that the proffered testimony is properly admissible) (citations omitted).[4] Since Captain McCloskey is qualified, and her opinions have a reliable basis in both fact and data, she should not be excluded.

## FACTS RELEVANT TO MOTION

Plaintiff's Complaint states:

> Plaintiff Robie W. Walls served in the United States Navy from 1955 to 1959 as a Torpedoman's Mate 3rd Class. The Plaintiff served onboard ships that were homeported, repaired and/or overhauled at ports including, but not limited to Newport, Rhode Island. The Plaintiff's duties included refurbishing torpedoes. **As a result of Plaintiff's Naval service as set forth above, it is believed that Plaintiff was exposed to asbestos dust, fibers and/or particles without controls, warnings or protection**.

*See* [DE 1 at ¶ 41] (emphasis added). *See also* [DE 87 at ¶ 39]; and [DE 138 at ¶ 39].

In 1955, Mr. Walls enlisted in the United States Navy. [DE 268, Ex. 1; 25:2-4] After basic training, he was assigned to serve as a Seaman Duce on a destroyer, the USS

---

[4] A copy of this unreported case is attached as **Exhibit 1**.

4829-2697-4452, v. 6

CHARLES H. ROAN [DE 268, Ex. 1, 26:5-9]. While onboard the ROAN, his rank was elevated to seaman and then to torpedoman 3rd class. [DE 268, Ex. 1, 26:12-14]. He served on the ROAN for "approximately three and a half years." [DE 268, Ex. 1, 26:15-21]. As a torpedoman, Mr. Walls' duties consisted of cleaning, maintaining the torpedoes and tubes, and serving as a patrol officer for shore patrol. [DE 268, Ex. 1, 26:22-25;27:1-23]. Notably, Mr. Walls duties also included painting. [DE 268, Ex. 1, 26:22-27:1-3]; [DE 268, Ex. 2, 81:12-17.] While painting in the Navy, this included sanding and removal of chipped paint. [DE 268, Ex. 4, 69:21-70:12]. At Mr. Walls' deposition, he recalled painting torpedo tubes, and the deck and depth changes [DE 238, Ex. 2, 215: 23-25; 216:1-2]. While on the ROAN, he was sent to the Mediterranean for a 6-month mission (called a cruise), that included the drill practice and the firing of weapons. [DE 268, Ex. 2, 83:14-84:23]. The ROAN also cruised to Gitmo City in Cuba where exercises were performed. [DE 268, Ex. 2, 92:14-19]. Mr. Walls testified that he slept in quarters with insulated pipes. [DE 268, Ex 2, 81:19-24]. Additionally, Mr. Walls recalled two cruises to the Mediterranean, and a trip to Cape Town, South Africa. [DE 268, Ex. 2, 109:15-21]. Mr. Walls testified about rough seas on both the ARCADIA and the ROAN.[5] [DE 268, Ex. 4, 73:1-18]. Mr. Walls testified that the ROAN went into dry dock (for ship overhaul and repairs) in Brooklyn, New York. He testified that while the ship was in dry dock for 2-3 months, he continued to sleep onboard the ship. [DE 268, Ex. 1, 28: 5-9]; [DE 268, Ex. 2, 212:14-24]. Mr. Walls

---

[5] *See* [DE 268], Ex. 3, 17:16-23 (referencing rough seas and that it was worse on the ROAN, and Mr. Walls referred to it as a "tin can").

4829-2697-4452, v. 6

testified that while in dry dock in Brooklyn, the ship overhaul included engine and boiler work. [DE 268, Ex. 3, 15:19-16:11]. While this was occurring, his duties included cleaning. [DE 268, Ex. 1, 29:5-7]. Mr. Walls testified that he ate three meals a day in the mess halls of the ship with machinists and others serving in the same rankings. [DE 268, Ex. 2, 221:2-222:2].

After a few years on the ROAN, he requested a transfer and was assigned to a destroyer tender ship, the U.S.S. ARCADIA, where he served for a year and a half. [DE 268, Ex. 1, 29:16-25; 31:3-6]. His duties on the ARCADIA were to pick up torpedoes off of various destroyer ships and transport them back to the mothership tender (ARCADIA). [DE 268, Ex. 1, 31:23-32:9]. On the ARCADIA, he again slept in quarters with insulated pipes. [DE 268, Ex. 2, 100:9-18]. While serving on the ARCADIA, the ship went on a 6-month cruise to the Mediterranean. [DE 268, Ex. 2, 106:16-19].

During the course of discovery in this case, one of the Defendants produced an affidavit of William Horan, a retired U.S. Navy veteran, who served aboard the ARCADIA from 1955 to 1959 as a boiler technician. [DE 267, Ex. 5, ¶¶1 & 2]. He performed boiler work on the ARCADIA and on ships that were tied up to or docked to the ARCADIA. *Id.* at ¶ 3. In Mr. Horan's affidavit, he admits that he personally performed work on boilers involving the disturbing of asbestos. *Id* at ¶¶ 5-10. Mr. Horan claimed this was dusty work which covered his clothes with asbestos dust. *Id.* at ¶ 5. Mr. Horan claims he and others wore dirty and dusty clothing throughout the ship including during lunchtimes a during recreational times. *Id.*

6

4829-2697-4452, v. 6

Captain McCloskey is Eaton's Naval Expert, her credentials are set forth on her Curriculum Vitae (attached as **Exhibit 2**) disclosed during discovery. Captain McCloskey issued a report on March 8, 2021, which is attached as **Exhibit 3**. She issued a supplemental report on July 15, 2021, and it is attached as **Exhibit 4**. She was deposed by Plaintiff's counsel on July 19, 2021. A copy of Captain McCloskey's deposition transcript is attached as **Exhibit 5**.

Eaton's other experts have opinions related to Mr. Walls' naval career. Dr. Shannon Gaffney, Eaton's expert certified industrial hygienist stated in her report dated March 2, 2021 that:

> **Based on his testimony, Mr. Walls may have been exposed to amphibole asbestos fibers through his work around insulation while service in the U.S. Navy. For example, Mr. Walls testified that, while serving about the U.S.S. Charles H. Roan and U.S.S. Arcadia, he slept in the quarters located one deck below the main deck (Walls 2/26/20: p. 28; Walls 2/27/20: P. 80, 100). He stated that he also lived about the U.S.S. Charles H. Roan while it was being overhauled in drydock (Walls 2/28/20: p. 15-16). He indicated that there were "[v]ery few" insulated pipes above the ceiling in his sleeping quarters aboard the U.S.S. Charles H. Roan and the U.S.S. Arcadia (Walls 2/27/20: P. 81, l. 22, p. 101). From the 1930s to the 1970s, amosite containing thermal insulation was used widely on U.S. Navy vessels for a number of applications, including turbine insulation, valve insulation, fittings, flanges, and pipes (Fleisher _et al._, 1946; Hollis _et al._, 2009, Marr, 1964; Rushworth, 2005). With sufficient cumulative exposure, amphibole asbestos is known to be more potent than chrysotile with respect to increasing one's risk of developing pleural mesothelioma (ATSDR, 2001).**

_See_ [DE 358-5, at p. 55-56] (Report of Shannon Gaffney PhD, MHS, CIH).

4829-2697-4452, v. 6

Dr. Oury, Eaton's expert pathologist in his report dated April 14, 2021 states:

**In my original report, I confirmed that Mr. Walls had an epithelial mesothelioma of the right pleura. Digestion studies were limited to lymph node tissue from block C2 of the specimen described above. The finding of slightly elevated levels of asbestos bodies by light microscopic digestion studies indicates that prior exposure to amphibole asbestos is the cause of Mr. Walls' mesothelioma. The findings from the RJ Lee Group report suggest that exposure to the asbestiform amphibole anthophyllite was the likely fiber type that caused Mr. Walls' mesothelioma, but this finding is limited as only one asbestiform anthophyllite fiber was found. The findings from these digestion studies further support the conclusions from my original report that any potential exposure to friction products did not contribute to the pathogenesis of Mr. Walls' mesothelioma as these products potentially contained chrysotile asbestos and did not contain anthophyllite asbestos. All opinions are to a reasonable degree of medical certainty.**

*See* [DE 358-3 at p. 1] (Supplemental Report of Dr. Oury, Dated April 14, 2021).

## STANDARD OF REVIEW

The rule governing the introduction of expert testimony, Federal Rule of Evidence 702, requires judges to perform a gatekeeping function to assess whether proffered expert testimony is both reliable and relevant. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Federal Rule of Evidence 702 provides that expert opinion testimony is admissible when: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon scientific facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the witness has applied the principles and methods reliably

8

to the facts of the case. "Referring to subsection (a), our Court has explained that whether testimony "assist[s] the trier of fact" is the "touchstone" of Rule 702. *U.S. v. Campbell*, 963 F.3d 309, 314 (4th Cir. 2020) (*citing Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir. 1986). A court must consider the relevance of an expert's testimony by determining "whether expert testimony proffered… is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (*quoting U.S. v., Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). This has been described as one of "fit". The *Daubert* inquiry offers flexibility to modify the inquiry to fit the case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (quoting *Daubert*, 509 U.S. at 592–94). Those factors are part of a "flexible" inquiry, so they do not form "a definitive checklist or test." *Daubert*, 509 U.S. at 593-94. The Court in *Kumho Tire Co*. noted that *Daubert* is not limited to the testimony of scientists, but also applies to testimony from experts based on "technical" and other "specialized knowledge." *Kumho Tire Co*., 526 U.S. at 141.

Further, in determining whether an expert's opinion is admissible, courts look to the qualifications of a proffered witness. *See Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158, 1998 WL 546097, *3 (4th Cir. Aug. 20, 1998) (unpublished)[6]. Under Rule 702, an expert's opinion must be grounded in some specialized skill, knowledge or experience in order to be relevant. *See Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); Fed. R. Evid. 702. "Therefore, there must be a fit between the expert's field of knowledge and the

---

[6] A copy is attached as **Exhibit 6**.

issues involved in the case." *Dellinger v. Pfizer Inc.*, 5:03CV95, 2006 WL 2057654, *8 (W.D.N.C. July 19, 2006) (*citing Bourne v. E.I. DuPont De Nemours & Co.*, 189 F.Supp.2d 482, 495 (S.D.W.Va. 2002)). "Where an expert's methodology is grounded on his experience…a proper methodology analysis focuses on three areas: 1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied ot the facts of the case. *SAS inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.NC. 2015) *aff'd* 874 F.3d 370 (4th Cir. 2017).

The admission of expert testimony must be considered within the context of the other rules of evidence. Rule 403 provides that the court must ensure that the probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury… Fed. R. Evid. 403. "[T]he balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *U.S. v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996) (*citing United States v. Terzado-Madruga*, 879 F.3d 1099, 1117 (11th Cir. 1990)).

## Law and Argument

I. **Captain McCloskey is qualified based on her education, training and experience, and her opinions are within her field of experience**

Plaintiff ignores Captain McCloskey's qualifications when she simply states that Captain McCloskey is an archival researcher who obtains and reviews records open to the public. [DE 267 at p. 11]. Captain McCloskey had a 27-year naval engineering career

10

serving in the United States Navy beginning in 1980 when she joined as an Engineering Duty Officer through a specialized program. [Ex. 3 at pp. 1-2]. Her experience will be helpful and valuable to a jury in that her "experience spans the operation, maintenance, repair modernization, and construction of all classes of steam and nuclear-powered ships and submarines." *Id.* at p. 1. She has personal knowledge of ship overhaul and repair as she toured vessels in overhaul and repair at the Mare Island Shipyard production shops and docks, and had hands on introductory training on various construction and repair trades that worked aboard ships. *Id* at p. 2. She is well qualified to discuss asbestos-containing materials aboard ships as she served as an Asbestos Control Officer overseeing and "directed the removal of, repairs to and the installation of lagging on various equipment, piping system and valves throughout surface ships." *Id.*

She attended Naval Postgraduate School and earned a post graduate masters of science degree in mechanical engineering in 1986. *Id.* Following graduation, she attended for a second time the Engineering Duty Officer Course at Mare Island Naval Shipyard. *Id.* She was assigned to the Project Office, Supervisor of Shipbuilding, Conversion and Repair, USN, Portsmouth, VA from 1986 to 1989 where she was responsible for 3 separate year-long ship overhauls totalling 190,000 mandays of repair and modernization for guided missile destroyer, a destroyer tender and an amphibious cargo ship. She oversaw the prime contractor and multiple sub-contractors in the repairs to various ship main propulsion systems, boiler control systems and other vital ship systems. *Id.* at p. 3. She served as Chief Engineer aboard the USS THEODORE ROOSEVELT and oversaw the work of over

11

4829-2697-4452, v. 6

300 engineers for operation and maintenance of the ship's service systems, auxiliary piping, and various other of the ship's systems. Her other extensive experience is more fully set out in her CV at Ex. 2 and outlined in her report at Ex. 3, at pp. 1-5.

Through her personal training, specialized knowledge, education and experience she received in the U.S. Navy as a duty officer for 27 years, Captain McCloskey is familiar with "plans, designs, specifications, manuals, qualified product lists, departure reports, and other documents used in the construction and repair of United States Navy and United States Coast Guard ships." *Id.* at p. 5. She is also "familiar with rate training manuals and correspondence course textbooks…[as she used] technical manuals and plans for the equipment located in the machinery space and other spaces aboard Naval vessels." *Id.* Based on her experience, training and education she will be able to "assist the jurors in the necessary understanding of the types of materials used in various ship applications, the composition of those materials and the approximated quantity by weight and other measurements of materials, the physical location of machinery, equipment and materials and the procedures for the installation and removal of machinery, equipment and materials." *Id.* at p. 6. She has experience in the interpretation and use of historical Navy Department and military specifications, ship drawings, training manuals, Quality Product Lists, technical manuals, instruction books, and operating procedures. *Id.*

Based on her education, training and experience, she will be able to assist the jurors "in the understanding of job responsibilities, training, duties of enlisted Sailors … as well as interpretation of the information found in the service records of enlisted sailors and …

4829-2697-4452, v. 6

personnel records." *Id*. Because of her extensive experience, training, and specialized knowledge, Captain McCloskey can help the jury understand what products were likely to be on the ships that Mr. Walls served. She will assist jurors in understanding the hierarchy of the Navy, rates, ratings, job classifications and duties of workers within various job ratings.

II.     **There is a sufficient factual basis for Captain McCloskey to testify about the presence of asbestos-containing products on the ROAN and ARCADIA**

Captain McCloskey relied on fact specific materials including the Plaintiff's complaint, Mr. Walls' deposition testimony, his available military records, U.S. Navy documents showing asbestos-containing materials on the ships (including the ones) Mr. Walls' served, and an affidavit from a U.S. Naval service man that worked aboard the ARCADIA and other ships that ARCADIA tendered that stated that Mr. Horan worked with and around asbestos-containing products. *See* [DE 267, Ex. 5]. Captain McCloskey's testimony will be helpful to a jury as she can assist the jury in reviewing ship engineering drawings (she is an engineer), specifications that directed the use of asbestos containing products and materials. Her opinions are based on the review of specifications in effect at the time which provided for the "use of asbestos-continuing insulation, lagging, cement, and adhesive was included in the specifications in effect during the time of the construction of the USS CHARLES H. ROAN (DD 853) and USS ARCADIA (AD 23) that were conducted form its commissioning through the time period in which the plaintiff Mr. Robie W. Walls was aboard the ships." *Id*. at p. 7. She references various exhibits, including

13

Exhibit GRM No. 61, that was in effect during the time of the construction of ROAN and the ARCADIA, which had the Navy insulation and lagging specifications including asbestos pipe covering, thermal insulation, block, roll, felt and other asbestos-containing products. *Id*. at 8. Her Exhibit GRM No. 61 listed the military specifications for the Navy Ships including those in effect and during the times of repair and modernization of the ROAN and the ARCADIA. *Id*. Lagging products and other asbestos-containing products were on the naval ships and documents reflecting this are found in the U.S. Navy documents that Captain McCloskey relied on including, but not limited to: GRM. No. 79-DD692 & DD710 Class, Exhibits DD 710 Drawings 10-29 and 34-38 and Exhibits AD23-5, AD23-10, AD23-17, and AD23-26. *Id*. at p. 9. Her report discusses the history of construction of the ships, and the history as to the machinery on board the ROAN and ARCADIA. *Id*. at pp. 10-17.

Her opinions were also based on her review of the Plaintiff's complaint[7], Mr. Walls' responses to master discovery and the transcripts of Mr. Walls' depositions along with the various exhibits. She reviewed and relied on (among others) U.S. Naval specifications, engineering drawings, and manuals. She reviewed ship specific documents that reflect the basis of her opinion that the ROAN and ARCADIA contained amosite thermal insulation and lagging along with other asbestos-containing products. *See* Ex. 3 at pp. 6-10.

Her opinions are included in her report, and include that:

---

[7] Including the allegations of Mr. Walls' naval service and exposure to asbestos. *See* [DE 1 at ¶ 41]. *See also* [DE 87 at ¶ 39]; and [DE 138 at ¶ 39].

> **Mr. Robie W. Walls' work aboard a Navy vessel frequently put in close proximity to others working with asbestos-containing pipe covering, block insulation, cements, cloths, insulation, adhesive, boiler refractory and insulation, electrical cables and wires, and decking aboard ship, particularly when these materials became friable and/or during rip-out and replacement of these material and clean-up of debris, and presented a great potential for exposure both while in service and during removal and replacement within the confined and poorly ventilated spaces of a ship.**

*See* Ex. 3 at p. 6.

Furthermore, she also reviewed the affidavit of William Horan, the serviceman who was stationed aboard the ARCADIA and other destroyer tenders between 1955 and 1959 as a boiler technician. [DE 267, Ex. 5]. While the Plaintiff claims Mr. Horan's affidavit is "irrelevant" [DE 267 at p. 15], Mr. Horan's affidavit stated that he and others aboard the ARCADIA were exposed to significant amounts of asbestos dust. *See* [DE 267, Ex. 5]. Mr. Horan's affidavit stated that "all of the pipes were covered with asbestos lagging." *Id*. at ¶ 12.

Further, according to Mr. Horan, during "…multiple shake down cruises and a Mediterranean cruise… the U.S.S. Arcadia would encounter rough weather at times. The screw (propeller) would be lifted out of the water and cause the whole ship to shake violently. During these events, I specifically recall asbestos being shaken loose from clamps, and the piping above our heads. Whole ship compartments would be filled with asbestos dust." *Id*. at ¶ 13. It would have been impossible to have served aboard the U.S.S. Arcadia during the 1950s and not have been exposed to significant amounts of dust." *Id*. at

15

¶ 14.

Captain McCloskey testified at her deposition on July 19, 2021 that:

"…my knowledge of the asbestos-containing products on both the USS Charles H. Roan and the USS Arcadia, coupled with my training as an asbestos control officer in the United States Navy on not only a destroyer tender like the Arcadia, but on other vessels, I can agree that with that knowledge and personal experience, I can state, without a doubt, my opinion as put forward in the first opinion that you read from our report on page 6."

*See* Ex. 5, 31:1-24.

She goes on to state in her deposition:

"… I can offer and will offer on board two different vessels that are named by both himself and in his service records and the unnamed destroyer that Mr. Walls testified he was on board during his service on the USS Arcadia put him in the proximity to not only work that was in progress by others that caused release of asbestos from asbestos-containing products installed in that ship, but also his testimony and my own experience as one of the sailors on board the vessel, living on board a vessel and eating on board the vessel would put him in proximity to those shipmates as well as shipyard personnel that had worked with asbestos-containing products, which would have provided secondary exposure to Mr. Walls."

*Id*. at 32:22-25; 33:1-12.

III. **Plaintiff's own experts' opinions as to Mr. Walls' Naval Career**

**A. Plaintiff's expert, Dr. Finkelstein admitted that Mr. Walls May Have Been Exposed to Asbestos in the US Navy**.

Plaintiff's expert, Dr. Finkelstein admitted that Mr. Walls may have been exposed to asbestos in the Navy.  Dr. Finkelstein testified in this case as follows:

Q**. Was Mr. Walls exposed to asbestos while he was in the Navy?**
**MR. PAUL: Object to form**
A.      **He may have been, yes.**

Q**. If the fiber burden analysis for Mr. Walls lymph nodes demonstrates**

16

**the presence of amosite, do you agree that the most likely source for that fiber was his work in the Navy?**
**MR. PAUL: Object to form**
**A.      It is certainly true that amosite containing insulation was used in the Navy.  That could've been a source, yes.**

**Q. Are you able to identify any other potential sources for amosite assuming it's found in Mr. Walls lymph nodes.**
**A. No.**

*See* Deposition of M. Finkelstein dated April 5, 2021 at [DE 321, Ex. 3 at 29: 22-30:12.] [8]

### A. Plaintiff's expert, Christopher DePasquale, MIH, CIH, agrees that Naval Ships Mr. Walls served on most certainly contained Asbestos Lagging

Plaintiff's expert industrial hygienist, Christopher DePasquale, MPH, CIH, writes

in his expert report that:

> The ships that Mr. Walls served on during his time in the US Navy would have most certainly utilized asbestos-containing material, primarily asbestos-containing thermal system insulation (TSI).  Mr. Walls testimony does not describe situations that would have clearly resulted in his exposure to asbestos.

*See* relevant excerpts of the Report of Plaintiff's expert hygienist, C. DePasquale attached as **Exhibit 7** at p. 4.

Furthermore, at his deposition on May 25, 2021[9], Plaintiff's expert, Christopher DePasquale, was asked:

> **Q. And you note there that it's well-known that ships of the era were – used a great deal of asbestos-containing insulation; fair?**
> **MR. PAUL: Objection to form.**
> **THE WITNESS: That is fair.**

---

[8] There is motion practice relating to compelling Plaintiff to turn over additional pathology material and information currently before the Court.  *See* [DE 207] Pneumo Abex, LLC's motion to compel, [DE 215] Eaton's notice of joinder in motion to compel, [DE 231], Plaintiff's response in opposition to motion to compel, and [DE 232] Pneumo Abex, LLC's reply in Support of Motion to Compel.
[9] A copy of the relevant excerpts of C. DePasquale's deposition on May 25, 2021 is attached as **Exhibit 8**.

4829-2697-4452, v. 6

[Ex. 8, 32: 1-5].

> **Q. So do you have any reason to dispute there would be in the neighborhood of 40 tons of thermal insulation – asbestos-containing thermal insulation on a ship like the Charles Roan that Mr. Walls served on?**
>
> **MR. PAUL: Object to form**
>
> **At this point, I don't.**

*Id*. at 34: 6-12.

Christopher DePasquale further testified (over objections) that asbestos-containing thermal insulation was not just used in the machinery spaces, but it also was also used over the ship including insulation of hot piping, used to heat the ship, for cooking, and showers. *Id*. at 34:22-25; 35:1-10. Furthermore, plaintiff's expert admitted over objection that "…it was possible that he had exposure. But again, you know, just based on his testimony, there was no clear descriptions of those opportunities". *Id*. at 35:11-21. Furthermore, Christopher DePasquale testified over objection that at times, a World War II era Navy ship like those that Mr. Walls served on at times sailed on rough seas and occasionally fired weapons. *Id*. at 36:9-20. Lastly, Christopher DePasquale testified over objection that he would have been around insulation by virtue of just being aboard the Naval ships. *Id*. at 36:4-8.[10]

## IV. Plaintiff Cannot Shift the Burden of Proof to the Defendants and Capt. McCloskey meets the Evidentiary Thresholds

Plaintiff attempts to improperly shift the burden in this case, as she claims that "[i]n

---

[10] Furthermore, Plaintiff's other expert Dr. Maddox, also agreed that asbestos-containing insulation was used on Navy ships in the 1950s. *See* deposition of J. Maddox, Jun. 23, 2021 [DE 324, Ex. 4, 119; 6-9].

order to implicate an exposure to amphibole asbestos as a cause of Mr. Walls' mesothelioma, a defense expert would have to place Mr. Walls around specific amphibole-containing products and be able to testify that these products were disturbed in close proximity to Mr. Walls on a regular and frequent basis." *See* [DE 267 at p. 10 and footnote 47] *citing* to *Lohrmann v. Pittsburgh Corning Corp*., 782 F.2d 1156, 1162 (4th Cir. 1986). This is an improper attempt by Plaintiff to shift the Plaintiff's burden in this case. *Lorhmann* discusses the evidence required by a plaintiff to prove causation in asbestos cases. Defendants have no such burden. Eaton solely has to establish the reliability and the relevance of Captain McCloskey's testimony.

## V.     Captain McCloskey's Testimony Is Relevant

Captain McCloskey's opinions are relevant, and well-grounded on the facts of this case.  There is ample evidence supporting the use of asbestos-containing materials specified by the Navy, that were present onboard the various ships Mr. Walls served on. Captain McCloskey's testimony is relevant to the issue of fact in this case as to whether Mr. Walls' mesothelioma was caused by amphibole exposure during his time serving in the Navy. Captain McCloskey's testimony is certainly relevant in that Eaton's expert pathologist, Dr. Oury opines that chrysotile asbestos exposure would not have caused Mr. Walls' mesothelioma, and was caused by amphibole exposure. Additionally, Dr. Gaffney, Eaton's certified industrial hygienist, opines that:

> **Based on his testimony, Mr. Walls may have been exposed to amphibole asbestos fibers through his work around insulation while service in the U.S. Navy. For example, Mr. Walls testified that, while serving about the U.S.S. Charles H. Roan and U.S.S. Arcadia, he slept in the quarters**

**located one deck below the main deck (Walls 2/26/20: p. 28; Walls 2/27/20: P. 80, 100). He stated that he also lived about the U.S.S. Charles H. Roan while it was being overhauled in drydock (Walls 2/28/20: p. 15-16). He indicated that there were "[v]ery few" insulated pipes above the ceiling in his sleeping quarters aboard the U.S.S. Charles H. Roan and the U.S.S. Arcadia (Walls 2/27/20: P. 81, l. 22, p. 101).**

*See* [DE 358-5, at p. 55-56] (Report of Shannon Gaffney PhD, MHS, CIH).

As such, her testimony is relevant to the jury's determination as to what was a substantial factor in causing Mr. Walls' disease. While Plaintiff is correct that Captain McCloskey is not a doctor or a certified industrial hygienist, Eaton has not offered her as such, and Eaton has retained Dr. Oury, (Dr. Bandli) and Dr. Shannon Gaffney, MPH, CIH, who will testify on those specific matters, within their specialties. Captain McCloskey's testimony rests on a reliable foundation and is relevant to the task at hand. *Nease v. Ford Motor Co.*, 848 F,3d 219, 229 (4th Cir. 2017) (*quoting Daubert*, 509 U.S. at 597). Relevant evidence is evidence that helps the trier of fact to understand the evidence or to determine a fact in issue." *Nease*, 848 F. 3d at 229 (*quoting* Daubert, 509 U.S. at 591*)*.

## CONCLUSION

Wherefore, Eaton respectfully requests that the Court deny Plaintiff's *Daubert* Motion to Exclude Evidence of Occupational or Bystander Exposure to Asbestos in the US Navy and to Exclude Defense Naval Researchers [DE 264].

This the 20th day of August, 2021.

/s/ GINA M. VON OEHSEN CLEARY
RICHARD T. BOYETTE
N.C. State Bar No. 7623
GINA M. VON OEHSEN CLEARY

20

N.C. State Bar No. 53941
GEORGIA H. MALIK
N.C. State Bar No. 56530
CRANFILL SUMNER LLP
Post Office Box 27808
Raleigh, North Carolina 27611
Phone:      (919) 828-5100
Facsimile:  (919) 828-2277
Email:      rtb@cshlaw.com
              gcleary@cshlaw.com
              gmalik@cshlaw.com
*Attorneys for Defendant Eaton Corporation*

## **CERTIFICATE OF WORD COUNT**

The undersigned certifies that this Response Brief is in compliance with Local Rule 7.3(d)(1). The number of words in this Brief, exclusive of the caption, signature lines, certificate of service, certificate of word count, and any cover page or index, does not exceed 6,250 words, according to the word count function of the word processing software used to prepare the Brief.

/s/     Gina M. Von Oehsen Cleary

4829-2697-4452, v. 6

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:20-cv-00098-LCB-LPA

| | | |
|---|---|---|
| LAURA M. WALLS, Individually and as Executor of the Estate of ROBIE W. WALLS | ) ) ) ) | |
| Plaintiffs, | ) ) | **CERTIFICATE OF SERVICE** |
| v. | ) ) | |
| FORD MOTOR COMPANY, et al. | ) ) | |
| Defendants. | ) | |

The undersigned hereby certifies that on the 20th day of August, 2021, I electronically filed the foregoing *Brief in Response and in Opposition to Plaintiffs' Daubert Motion to Exclude Evidence of Occupational or Bystander Exposure to Asbestos in the US Navy and to Exclude Defense Naval Researchers* with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system which will send notification of this filing and an electronic copy of same to all counsel of record registered with the CM/ECF system, and I hereby certify that I have thereby electronically served the document upon all counsel in this action registered with the CM/ECF system.

/s/GINA M. VON OEHSEN CLEARY
RICHARD T. BOYETTE
N.C. State Bar No. 7623
GINA M. VON OEHSEN CLEARY
N.C. State Bar No. 53941
GEORGIA H. MALIK
N.C. State Bar No. 56530
CRANFILL SUMNER LLP
Post Office Box 27808
Raleigh, North Carolina 27611
Phone:        (919) 828-5100
Facsimile:   (919) 828-2277
Email:        rtb@cshlaw.com
                  gcleary@cshlaw.com
                  gmalik@cshlaw.com
*Attorneys for Defendant Eaton Corporation*

22