# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAURA M. WALLS, Individually and )
as Executor of the Estate of ROBIE )
W. WALLS, )
                              )
              Plaintiff, )
                              )
            v. )             1:20cv98
                              )
FORD MOTOR COMPANY, et al., )
                              )
             Defendants. )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Pneumo Abex LLC's Motion to Compel the Plaintiff" (Docket Entry 207) (the "Discovery Motion"), as well as "Defendant Strick Trailers, LLC's Joinder in Pneumo Abex LLC's Motion to Compel the Plaintiff and to Compel Documents" (Docket Entry 210) and "Defendant Cummins, Inc.'s Joinder in Pneumo Abex, LLC's Motion to Compel the Plaintiff and to Compel Documents" (Docket Entry 214) (collectively, the "Motions to Join"). For the reasons that follow, the Court will grant the Motions to Join and grant in part and deny in part the Discovery Motion.[1]

---

[1] The undersigned United States Magistrate Judge enters an order rather than a recommendation because "motions to compel discovery" under the Federal Rules of Civil Procedure constitute "[n]ondispositive matters [which] may be referred to a magistrate judge [for rulings] without the parties' consent," Mvuri v. American Airlines, Inc., 776 F. App'x 810, 810-11 (4th Cir. 2019) (citing Fed. R. Civ. P. 72(a)), cert. denied, ___ U.S. ___, 140 S. Ct. 1227 (2020).

## BACKGROUND

### I. Factual and Procedural History

By way of summary, Laura M. Walls (the "Plaintiff") has asserted products-liability claims on behalf of the estate of her husband, Robie W. Walls (the "Decedent"), as well as an individual claim for loss of consortium. (Docket Entry 138, ¶¶ 49–98.) More specifically, Plaintiff has alleged that Defendant Pneumo Abex LLC ("Abex") and numerous other "'Product Defendants' . . . manufactured, sold, and/or distributed asbestos-containing products or raw asbestos materials for use in North Carolina and other states at times relevant to this action" (id., ¶ 19). According to Plaintiff, Decedent's exposure to such products caused him to develop mesothelioma, resulting in his death on October 15, 2020. (Id., ¶¶ 2, 8–17.)

### A. Obtaining and Dividing Decedent's Pathology Materials

The origin of the instant dispute dates back to Decedent's deposition in February 2020, when "counsel for Defendants conveyed [to counsel for Plaintiff ('Plaintiff's Counsel')] their interest in having a Fiber Burden Analysis ('FBA') performed on the available lung tissue of [Decedent]." (Docket Entry 126 at 1.) As Abex has explained, an FBA required access to "[Decedent's] lung pathology materials[, which] are critical to determining the cause of [his] mesothelioma." (Docket Entry 207-1 at 1.) Plaintiff's Counsel evidently agreed "to cooperate with obtaining the pathology

2

materials" (id. at 2) and, to that end, served a subpoena on Duke University Health System ("DUHS") in August 2020 (Docket Entry 126 at 1).

Pursuant to a request from counsel for DUHS, counsel for Abex ("Abex's Counsel") coordinated with Plaintiff's Counsel to draft a letter requesting Decedent's pathology materials from DUHS. (See Docket Entry 207-2 at 2-3.) In jointly preparing that letter, Plaintiff's Counsel directed Abex's Counsel to request "[a]ll [o]riginal [p]athology [b]lock [m]aterials and [s]lides" (id. at 1) and memorialized the parties' agreement as follows:

> Plaintiff[] and Defendants may not conduct destructive testing of said pathology block material without an agreement between Plaintiff[] and Defendants as to the manner by which the materials are to be shared or by further order of the Court if an agreement cannot be reached between the parties. Also, . . . Dr. [Brent] Staggs [("Staggs")] will split all pathology equally from the entire block from [DUHS].

(Id.)[2]

DUHS ultimately declined to produce Decedent's pathology materials without a protective order. (See Docket Entry 126 at 1-2.) As a result, the parties sought, and the Court (per the undersigned United States Magistrate Judge) granted, such order, directing DUHS to release certain slides and paraffin blocks containing Decedent's lung tissue. (Docket Entry 127 (the

---

2  The parties alternately refer to the FBA as a "digestion." In this context, "digestion" denotes a process that "destroys organic matter [in a tissue sample] and leaves behind only inorganic particulates including asbestos fibers." 3 Margie Searcy-Alford, A Guide to Toxic Torts § 21.07 (2021).

3

"Protective Order") at 1–3.) Plaintiff's Counsel provided a copy of the Protective Order to counsel for DUHS. (See Docket Entry 207-3 at 9.)

Upon receipt of an "inventory" from DUHS, Plaintiff's Counsel noted to Abex's Counsel that the materials consisted of "all lymph and not lung tissue" (id. at 7), whereafter Abex's Counsel expressed an intent to "move forward [with the FBA]" (id. at 6). Plaintiff's Counsel then directed counsel for DUHS to send the available materials to Staggs, who would "do an even split for the parties' digestion experts." (Id. at 3.) After the parties finalized shipping arrangements, Abex's Counsel sent Plaintiff's Counsel the following message:

> Just so we are on the same page, I would request that we let [] Staggs know that [we] want the tissue to be divided in two equivalent and equal shares. By equivalent, I mean that he should not divide it (for example) as all pleura to one and all lung tissue for another — which could be half each). We need each side to have access to the same type and quantity of tissue. Lymph nodes should be split as evenly as possible so that both sides can do a [FBA]. Also, please have him take before and after pictures and also a few pictures that demonstrate[] how the tissue was split.

(Id. at 1.)[3] Plaintiff's Counsel agreed and offered to arrange a call with Staggs, which offer Abex's Counsel evidently declined. (See Docket Entry 231-2 at 2.)

---

3 "Pleura" refers to "the serous membrane investing the lungs and lining the thoracic cavity," Dorland's Illustrated Medical Dictionary 1460 (32d ed. 2012).

4

A few weeks later, Plaintiff's Counsel again confirmed that Staggs would "do everything as usual protocol" (Docket Entry 207-4 at 4), to include an "equal split of everything" (id.). In response, Abex's Counsel reiterated:

> As for the protocol, yes, just as we discussed. We want the tissue to be divided in two equivalent and equal shares. By equivalent, I mean that he should not divide it (for example) as all pleura to one and all lung tissue for another — which could be half each). We need each side to have access to the same type and quantity of tissue. Lymph nodes should be split as evenly as possible so that both sides can do a [FBA]. The before and after pictures should help to keep things square. We would also like pictures that demonstrate[] how the tissue was split.

(Id. at 2.)

In February 2021, after receiving Decedent's pathology materials, Staggs drafted a letter memorializing his review and distribution of the same. (See Docket Entry 207-5 at 1–11.) According to Staggs, "[he] received 26 H&E glass slides and the corresponding 26 paraffin blocks" (id. at 3), as well as "seven immunohistochemical he [sic] stained slides" (id.). Staggs examined the slides/blocks under a microscope, concluding that "15 slides/blocks contained essentially only tumor with or without some chest wall soft tissue." (Id.) He identified three slides/blocks (H12, H13, H16) that "contained tumor, pleura, and scant amounts of subpleural lung parenchyma" (id.)[4] and eight other "slides/blocks

_____

4  Lung "parenchyma" denotes "the essential elements of [a lung]," Dorland's Illustrated Medical Dictionary 1382 (32d ed. 2012), which "include the bronchi, bronchioles, alveoli, pulmonary (continued...)

[that] contained sections of lymph node, many showing involvement by tumor" (id. (describing Cl, C2, C3, Dl, El, Fl, H11, and H14)). He deemed the 11 blocks containing pleura, lung parenchyma, and/or lymph node "useful for potential fiber burden" (id. at 1 (implying that remaining 15 blocks containing only tumor possessed little or no value for analysis)).

Together with the letter, Staggs attached photographs depicting the tissues allocated to each party, including photographs in which he had circled the "scant lung parenchyma" (id. at 6) in H12, H13, and H16. (Id. at 5-10.) Staggs explained that he dissected the lung parenchyma from H13 and H16 and submitted that material, along with blocks C3, D1, E1 and H14 to Plaintiff's expert, Dr. Ronald Gordon ("Gordon"). (Id. at 3-4.) He submitted H12 (without dissection), as well as C1, C2, F1, H11, and "all remaining glass slides and all remaining tissue blocks containing primarily tumor" to Abex's Counsel. (Id. at 4.) Abex's Counsel forwarded those materials to an expert for Defendants, Dr. Tim Oury ("Oury"). (Docket Entry 207-1 at 3.)[5]  Shortly

_____

4(...continued)
veins, pulmonary arteries, and capillaries," 3 Margie Searcy-Alford, A Guide to Toxic Torts § 21.07 (2021).

5  Along with Abex, Defendants DCo LLC ("DCo"), PACCAR Inc. ("PACCAR"), ZF Active Safety US Inc. ("ZF"), Ford Motor Co. ("Ford"), Carlisle Industrial Brake & Friction, Inc. ("Carlisle"), Eaton Corporation ("Eaton"), Meritor, Inc. ("Meritor"), Morse TEC LLC ("Morse TEC"), CRA Trailers, Inc. ("CRA"), Navistar Inc. ("Navistar"), Strick Trailers LLC ("Strick"), and Cummins Inc. ("Cummins") have retained Oury in this action. (See Docket Entry
(continued...)

thereafter, Plaintiff's Counsel tendered Gordon for a deposition (Docket Entry 207-6 at 1 (proposing April 6, 2021, as deposition date)), which tender Abex's Counsel accepted (Docket Entry 207-7 at 1).

On March 17, 2021, Abex's Counsel contacted Plaintiff's Counsel, reporting that Oury could not perform the FBA on the material received (via Abex's Counsel) from Staggs. (See Docket Entry 207-9 at 5.) Abex's Counsel further relayed Oury's message that "blocks C3 [and] D . . . contain[ed] sufficient tissue for the FBA" and inquired whether Staggs still possessed those blocks. (Id.) Abex's Counsel and Plaintiff's Counsel thereafter exchanged several messages (see id. at 1-4), during which Abex's Counsel realized that Gordon had received blocks C3 and D (id. at 2). After Abex's Counsel asked Plaintiff's Counsel to obtain those blocks for Oury's use, Plaintiff's Counsel agreed to contact Gordon about the issue. (Id. at 1-2.)

When Abex's Counsel followed up with Plaintiff's Counsel a few days later (see Docket Entry 207-11 at 4), Plaintiff's Counsel noted that Staggs had allocated more material to Oury than to Gordon and questioned why two weeks elapsed between the receipt by Abex's Counsel of the material from Staggs and their request for additional material (id. at 3-4). Abex's Counsel responded, stating that she raised the issue as soon as Oury identified the

---

5(...continued)
207-10 at 8.)

7

problem and that Staggs had failed to follow the agreed-upon protocol. (Id. at 3.) Abex's Counsel again requested that Gordon relinquish blocks C3 and D for Oury's use. (Id.) In reply, Plaintiff's Counsel persisted in challenging the timeliness of the request by Abex's Counsel, argued that Staggs had divided the material appropriately, and declined to share tissue "samples from [Plaintiff's] less-than-equal split" (id. at 2). (See id. at 1–2.) Abex's Counsel objected to the notion that allocating blocks constitutes an even split, since "some blocks can have very little tissue" (id. at 1), and again inquired about the availability of blocks C3 and D (id. ("If Gordon has done an FBA and used all of the tissue, I would appreciate you letting us know.")).

On March 25, 2021, Plaintiff's Counsel agreed that Gordon would return the pathology material so that Plaintiff's Counsel could forward it to Oury, "retain[ing] some . . . for Plaintiff[]." (Docket Entry 207-12 at 3.) On March 30, 2021, Plaintiff's Counsel retracted that offer, explaining that he mistakenly believed Gordon's share of the material remained available. (Id. at 2.) As of that date, "[Gordon's] portion no longer exist[ed]." (Id.) That same day, when Abex's Counsel requested Gordon's report to "decide whether [they] need[ed] to do something about this issue" (id. at 1), Plaintiff's Counsel declined, representing that "Gordon [wa]s not a testifying expert at th[at] point" (id.).

8

**B. Oury Deposition**

On April 1, 2021, Oury participated in a deposition, clarifying some of the events that preceded the instant dispute. (See Docket Entry 207-10.) On March 16, 2021, after receiving Decedent's pathology materials, Oury called a paralegal who works for counsel for DCo to advise that "[t]here may be enough for digestion [in block C2]" (id. at 17), despite the fact that Oury had not received block C3, "the best block for doing digestions" (id.). According to Oury, "all five of the lymph nodes in block C3 [we]re appropriate for digestion, and they were much larger in size [than those in block] C2." (Id. at 39.) In contrast, although block C2 likewise contained five lymph nodes, only "two smaller ones . . . [lacked] tumor" (id. at 29), rendering that portion "suitable for digestion" (id.). As for the other four potentially useful blocks that Oury received from Staggs, he characterized block C1 as containing insufficient "normal lymph node for a digestion" (id. at 28), block F1 as "not useful" (id. at 29), block H11 as lacking "lymphoid tissue" (id.), and block H12 as "too . . . small . . . to do anything with" (id. at 28). Oury explained that he ordinarily received partial tissue from individual blocks appropriate for digestion, rather than a portion of undivided blocks. (Id. at 19; see also id. at 26.)

9

Oury had not yet conducted the FBA at the time of his deposition,[6] but he detailed his typical process, including his reliance on RJ Lee Group. (See id. at 30.) Oury described "choos[ing] the tissue that needs to be digested" and sending it to RJ Lee Group for extraction. (Id.) RJ Lee Group would "cut [the tissue] out of the block, re-paraffinize it, digest it, and prepare the filter." (Id.) Oury and RJ Lee Group would each use half of the filter, with Oury conducting the "light microscopy asbestos body quantification" and RJ Lee Group handling the analyses by scanning electron microscopy ("SEM") and transmission electron microscopy ("TEM"). (Id.) Oury identified Dr. Bryan Bandli ("Bandli") as "[t]he person [he] work[ed] with [at RJ Lee Group]" (id. at 45).[7]

Oury further testified regarding some potential limitations of the foregoing analyses. First, he explained that "[they] generally try to digest .1 to .3 grams" (id. at 21) and that the weight of the tissue could impact the usefulness of a digestion (see id.). For example, he deemed .2 grams "great" for a digestion, whereas .05 grams would yield "limited" negative results. (Id. at 43 ("If we see something [in a small sample] we'll have information that's

---

6 Oury attributed the delay to the attempt to obtain the more preferable block C3. (See id. at 30-31; see also id. at 42 (explaining why he "waited to proceed").)

7 Abex, DCo, Morse TEC, Carlisle, Ford, Eaton and CRA have retained Bandli. (Docket Entry 231-3 at 8 (noting that CRA no longer remained a party to this action).)

10

important but if we don't see something then it's a limited digestion.").) Per Oury, a negative result (i.e., no asbestos fibers) in a .1-gram lung tissue sample would allow a reviewer to conclude that "those levels are below what you would see in control individuals that have had no exposure." (Id. at 58.) However, a negative result in a smaller sample could not rule out "elevated levels" of asbestos. (Id.) Oury testified that RJ Lee Group would determine "the weight of the tissue [in block C2] . . . as soon as they cut it out of the block and re-paraffinize it" (id. at 44). Oury stated that they would analyze block C2 regardless of its weight. (See id. at 43 ("We're going to do the digestion, regarding [sic] of what I want it to be. So it will happen regardless.").)

Second, Oury asserted that an analysis yielding a single asbestos fiber would not necessarily indicate "elevated exposure" (id. at 59), suggesting that some asbestos may appear in "almost anybody's lung in the United States" (id. at 60). However, in his view, the presence of two asbestos fibers in a .1-gram sample would suggest "real elevation." (Id.)

Third, Oury distinguished lymph node digestions from digestions of "actual lung tissue" (id. at 46). He characterized the former as "pretty good" but clarified that studies more thoroughly supported the latter. (Id.; see also id. at 47 ("[T]here's more studies with lung, and that's why I would certainly would prefer to do [a digestion] on a lung because

11

there's better data.").)  In describing the places in the body one might detect asbestos fibers, Oury opined that "lymph nodes [we]re not a bad choice to look at because they are a draining site" (id. at 50).  (See also id. at 52-53 ("[B]oth the lung and the lymph node will have fibers that have been to the pleural space as well.").)

Finally, as concerns differences between types of asbestos, Oury confirmed that chrysotile has a shorter half-life than amphibole asbestos.  (Id. at 53-54.)[8]  Additionally, he agreed that some types of amphibole asbestos, like tremolite, may indicate exposure to chrysotile (because the latter may reflect "tremolite contamination").  (Id. at 54-55.)  He denied knowledge of any such relationship between anthophyllite and chrysotile.  (Id. at 55.)  He also explained that factors such as extent of exposure, time since exposure, and length of the fiber type's half-life can inform an analysis where tremolite, but not chrysotile, remains detectable in lung tissue.  (Id. at 55-58.)

**C. Expert Submissions**

In early April, Oury (with assistance from Bandli) analyzed a portion of Decedent's pathology materials, after which both Oury and Bandli produced reports.  (See Docket Entries 187-1 ("Oury

---

8 Asbestos fibers "are classified as serpentine or amphibole depending upon their physical and chemical characteristics."  3 Margie Searcy-Alford, A Guide to Toxic Torts § 21.07 (2021).  For example, serpentine asbestos includes chrysotile, whereas anthophyllite belongs to the amphibole category.  Id.

12

Supplemental Report," dated Apr. 14, 2021), 187-2 ("Bandli Report," dated Apr. 12, 2021).) As relevant here, Plaintiff's experts Dr. Edwin Holstein ("Holstein") and Dr. John Maddox ("Maddox") likewise prepared reports. (See Docket Entries 194-1 ("Holstein Supplemental Report," dated Apr. 27, 2021), 232-5 ("Maddox Supplemental Report," dated May 28, 2021).)

On April 26, 2021, Abex's Counsel requested that Plaintiff's Counsel provide the "[electron microscopy] grids analyzed by [] Gordon." (Docket Entry 207-13 at 2.) On May 7, 2021, having received no response, Abex's Counsel followed up on that query. (Id. at 1.) That same day, Plaintiff's Counsel acknowledged receipt of the Oury Supplemental Report and the Bandli Report but "decline[d] to produce materials reviewed or analyzed by [Plaintiff's] consulting experts in this case." (Id.) Plaintiff thereafter served Defendants with the Holstein Supplemental Report and Maddox Supplemental Report. (Docket Entries 194 (service on May 13, 2021), 202 (service on June 2, 2021).) The Court below summarizes the pertinent portions of each report.

### 1. Oury Supplemental Report

Oury began by describing the processes by which he and Bandli analyzed block C2. (See Docket Entry 187-1 at 1.) Upon initial examination, Oury did not detect any asbestos bodies in the "sections of lymph nodes without tumor." (Id.) Oury deemed three lymph nodes suitable for digestion, which he identified (by circling) and sent to RJ Lee Group. (Id.) "RJ Lee Group digested

13

the lymph node tissue [Oury had] circled (0.1141 grams wet weight) and then prepared a filter" (id.), half of which Oury received "for light microscopic asbestos body quantification" (id.). Oury observed five asbestos bodies "at 200x magnification." (Id.) According to Oury's summary of the report from RJ Lee Group, TEM analysis revealed one "asbestiform anthophyllite fiber" (whereas SEM analysis revealed none). (Id.) Oury concluded "that prior exposure to amphibole asbestos [wa]s the cause of [Decedent's] mesothelioma" (id.), although he qualified that conclusion since TEM analysis revealed only a single fiber (see id.). Oury noted that "[t]he findings from these digestion studies further support the conclusions from [his] original report that any potential exposure to friction products [associated with Defendants] did not contribute to the pathogenesis of [Decedent's] mesothelioma as these products potentially contained chrysotile asbestos and did not contain anthophyllite asbestos." (Id.) Oury maintained that "[a]ll opinions [we]re to a reasonable degree of medical certainty." (Id.)

2. Bandli Report

Bandli reported receiving block C2, "one sample of [Decedent's] paraffin[-]embedded tissue" (Docket Entry 187-2 at 1). Consistent with the Oury Supplemental Report, Bandli described his preparation of the sample, to include removing and weighing the tissue designated by Oury, digesting it, and depositing it on a filter. (See id.) Prior to digestion, the extracted tissue

14

weighed .1141 grams. (Id. at 4.) Bandli retained half the filter for analysis by SEM and TEM. (Id. at 1.) For both analyses, Bandli[9] recorded fibers bearing certain physical characteristics and identified them by "their elemental compositions" (id. at 2 (describing method as "supplemental identification procedure" for TEM)). Via SEM, Bandli discovered a single fiber "not consistent with any asbestos minerals." (Id. at 6; see also id. at 11-14 (count sheet recording no other fibers in 100 fields).) Via TEM, Bandli detected "[o]ne anthophyllite asbestos structure" (id. at 1). (See also id. at 21-28 (count sheet reflecting one anthophyllite fiber in Field 24, as well as various other particulates including cleavage fragments and talc).)[10]

### 3. Holstein Supplemental Report

Holstein opined that products associated with numerous Defendants "constituted a substantial factor in the causation of [Decedent's] malignant mesothelioma and death" (Docket Entry 194-1 at 7) or were "contributory to the causation of his malignant mesothelioma" (id. at 18).[11] Holstein criticized Oury's contrary

---

9  During his deposition, Bandli clarified that an individual working under his direction conducted some parts of the analyses. (See Docket Entry 231-3 at 10-11.)

10  Bandli defined a cleavage fragment as "a particle of a mineral that has formed through breakage along crystallographic planes of weakness within the crystal." (Docket Entry 231-3 at 6.) Bandli distinguished cleavage fragments from asbestiform fibers by their respective physical properties. (Id. at 6-7.)

11  Those opinions apply to Ford, Navistar, PACCAR, Strick,
(continued...)

15

conclusions that "some otherwise undocumented and unknown exposures to amphibole asbestos (varieties of asbestos other than chrysotile)" caused Decedent's mesothelioma and "that [Decedent]'s daily, decades-long exposures to chrysotile-containing brakes, clutches and vehicle gaskets played no role in the causation of [his] mesothelioma." (Id. at 2.) Holstein opined that the Oury Supplemental Report fails to "establish that [Decedent] had an occupational-level exposure to amphibole asbestos" and contended that "the absence of chrysotile asbestos [in Decedent's pathology materials]" did not disprove his "occupational-level of exposure to chrysotile asbestos." (Id.)

In particular, Holstein first distinguished asbestos fibers from asbestos bodies. (See id.) He defined asbestos fibers as "slivers of pure mineral." (Id.) According to Holstein, "[a]fter prolonged residence in the body, a tiny minority of such fibers becomes coated with a complex polysaccharide rich in iron." (Id.) That coating "makes asbestos bodies thicker and thus much easier to find using a light microscope," resulting in their documentation "in the medical literature simply because they are capable of being seen with a light microscope whereas most asbestos fibers cannot be seen with a light microscope." (Id.) Holstein observed that

_____

11(...continued)
ZF, CRA, Federal-Mogul Asbestos Personal Injury Trust, Cummins, Abex, Carlisle, Meritor, Morse TEC, and DCo. (Id. at 5-18.)

16

"[asbestos bodies] seem to form around amphibole asbestos fibers but not around chrysotile fibers."  (Id.)

Against that background, Holstein emphasized the failure by Oury and Bandli to establish "what would be 'normative' — what would be found in the tissues of any average adult resident of an urban area of the United States."  (Id.)  Holstein noted the absence of

> reliable and sufficient normative data on how many asbestos fibers or bodies one would expect to find in *lymph nodes* at all, much less *digested and concentrated lymph node tissue*, taken from ordinary adult residents of urban areas who have had no experience of the heavier exposures that occur in the workplace and in a few other settings.

(Id.)  Moreover, Holstein highlighted that Oury detected no asbestos bodies when, prior to digestion, he examined the intact lymph node tissue "using light microscopy" (id.).  In any case, even accepting the conclusion that anthophyllite asbestos caused Decedent's mesothelioma, Holstein pointed out "that the material data safety sheet (MSDS) provided by Abex for its brake linings indicates a significant talc component" (id. at 3), which "could easily constitute the source of the lone anthophyllite fiber reported by [] Bandli" (id.).

Turning to Oury's supposed "fail[ure] to establish that [Decedent's] decades-long exposures to chrysotile asbestos were *not* a substantial factor in the causation of his terminal cancer" (id.), Holstein asserted that "[i]nhaled chrysotile fibers

17

gradually disappear from view in the lungs and other tissues," especially as compared "to amphibole fibers, which are considerably more persistent in lung tissue." (Id.) Because Decedent's exposures to asbestos decreased in 1995 and ceased in 2002, Holstein opined that "the failure by [] Bondli [sic] and Oury to find evidence of chrysotile in [Decedent's] lymph node tissue cannot be used to deny chrysotile causation of his mesothelioma in light of his decades-long, thoroughly documented exposure to this mineral." (Id.)

### 4. Maddox Supplemental Report

Maddox found the following flaw with Oury's conclusions: "[t]he SEM/TEM studies were performed at the lowest statistical limit of that method, yielding a raw count of only one structure (fiber)." (Docket Entry 232-5 at 2.) He further noted that "[t]he light microscopic determination of five asbestos bodies does not (cannot) identify [the] type of asbestos" (id.), such that "[t]hey could be tremolite, harsh chrysotile, or something else." (Id.)

### D. Bandli Deposition

On June 4, 2021, in connection with arranging Bandli's deposition, Abex's Counsel requested from Plaintiff's Counsel "the filters/grids from [] Gordon" in order to provide them to Bandli for review. (Docket Entry 232-1 at 3.) Abex's Counsel then offered Bandli for a deposition "without waiver of [Abex's] request for th[o]se materials so that [its] experts can review and

18

comment." (Id.) The record reflects neither a response from Plaintiff's Counsel to that request by Abex's Counsel nor subsequent discussions concerning Abex's willingness to tender Bandli for a deposition. (See id. at 1–7.) The parties deposed Bandli in June 2021. (See Docket Entries 231-3, 232-3.)

In relevant part, Bandli testified that, for tissue digestion, he preferred a sample size ranging from .3 to .5 grams. (Docket Entry 231-3 at 7.) He acknowledged the existence of studies using as little as .1 gram but noted that "a larger mass of sample makes the analyses more efficient and allows you to achieve better analytical sensitivity." (Id. at 7–8.) In addition, Bandli agreed that "a small amount of tissue" may not constitute a representative sample and that a larger sample "help[s] with the confidence level for achieving a representative analysis." (Id. at 14.) Bandli defined "analytical sensitivity" as "the concentration in structures per gram that would be calculated based on the observation of a single structure in the analysis." (Id. at 15.)

Moreover, Bandli described how TEM analysis involved the use of a count sheet, on which an analyst records "any [asbestos] fibers encountered in any opening" of a grid prepared in connection with that mode of analysis. (Id. at 10–11.) Per Bandli, the typical protocol required observation of at least "40 openings or enough openings to achieve the desired analytical sensitivity . . . [of] 5,000 structures per gram." (Id. at 15.) As Bandli recounted, looking at a greater number of openings

19

increases the area analyzed and makes the analysis more sensitive, thereby decreasing the "numerical value of the analytical sensitivity" (id. at 16). Bandli also confirmed that 5,000 structures per gram represents a minimum threshold. (Id. ("[W]e ultimately want to have a lower value for the analytical sensitivity.").)

As concerns the analyses in this action, Bandli characterized the .1141-gram sample from block C2 as "a sufficient amount" (id. at 8) for achieving analytical sensitivity in the target range ("4,984 structures per gram in the [T]EM analysis" (id.)). Finally, he reported that someone working under his direction looked at 304 openings and identified a single anthophyllite fiber. (See id. at 10–11.)

**E. Discovery Motion and Motions to Join**

According to Abex, the parties engaged in "personal consultation and diligent attempts to resolve differences" (Docket Entry 207 at 2) concerning the production of Gordon's analysis based on the pathology materials that Abex attempted (unsuccessfully) to obtain. (See id. (describing communications as having taken place "over the course of three weeks").)[12] Via the Discovery Motion, Abex has sought "an Order [c]ompelling Plaintiff

---

12  Abex appears to have requested, on the following dates, Gordon's report and/or the filters/grids he analyzed: March 30, 2021 (Docket Entry 207-12 at 1), April 26, 2021 (Docket Entry 207-13 at 1–2), May 7, 2021 (Docket Entry 207-13 at 1), and June 4, 2021 (Docket Entry 232-1 at 3).

20

to produce [Gordon]'s fiber burden study." (Id. at 1.)  Plaintiff responded in opposition (Docket Entry 231), and Abex replied (Docket Entry 232).

Defendants Federal-Mogul Asbestos Personal Injury Trust ("Federal Mogul"), PACCAR Inc. ("PACCAR"), Eaton Corporation ("Eaton"), Morse TEC LLC ("Morse TEC"), Ford Motor Company ("Ford"), Meritor, Inc. ("Meritor"), and DCo LLC ("DCo") filed notices joining the Discovery Motion.  (Docket Entries 211, 213, 215, 216, 217, 218, 219.)  Defendants Strick Trailers LLC ("Strick") and Cummins Inc. ("Cummins") filed motions seeking the same relief.  (Docket Entries 210, 214.)  In opposing the Discovery Motion, Plaintiff acknowledged (but did not oppose) the foregoing notices and motions.  (See Docket Entry 231 at 1 n.1.)

## DISCUSSION

### I. Relevant Standards

### A. The Scope and Conduct of Discovery

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants."  Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment.  Under Federal Rule of Civil Procedure Rule 26 ("Rule 26"),

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving

the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. . . .

Fed. R. Civ. P. 26(b)(1).

Rule 26 requires litigants to exchange various information, including "the identity of any [expert] witness [they] may use at trial to present evidence," Fed. R. Civ. P. 26(a)(2)(A). Expert witnesses generally must prepare a report that memorializes, inter alia, the opinions they intend to offer, the basis for those opinions (to include "the facts or data considered"), and their qualifications. Fed. R. Civ. P. 26(a)(2)(B). "A party may depose any person who has been identified as an expert whose opinions may be presented at trial." Fed. R. Civ. P. 26(b)(4)(A).

However,

a party [ordinarily] may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
       (i) as provided in [Federal] Rule [of Civil Procedure] 35(b); or
       (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(D). Turning first to the second exception, "[t]he party resisting production bears the burden of demonstrating the information sought is entitled to protection under [the foregoing Rule], and the party seeking disclosure bears the 'heavy burden' of demonstrating 'exceptional circumstances' to justify discovery of any protected information." H/S Wilson

22

<u>Outparcels, LLC v. Kroger Ltd. P'ship I</u>, No. 5:15CV591, 2018 WL
1528187, at *2 (E.D.N.C. Mar. 28, 2018) (unpublished).

As concerns the first exception, Federal Rule of Civil
Procedure 35 ("Rule 35") provides (in relevant part) for a court-
ordered "physical . . . examination by a suitably licensed or
certified examiner" when a litigant places his or her physical
condition in controversy. Fed. R. Civ. P. 35(a)(1). Following
such examination, Rule 35 authorizes the person examined to obtain
"a copy of the examiner's report, together with like reports of all
earlier examinations of the same condition." Fed. R. Civ. P.
35(b)(1). In exchange, "the party who moved for the examination
may request — and is entitled to receive — from the party against
whom the examination order was issued like reports of all earlier
or later examinations of the same condition." Fed. R. Civ. P.
35(b)(3). "By requesting and obtaining the examiner's report, or
by deposing the examiner, the party examined waives any privilege
it may have — in that action or any other action involving the same
controversy — concerning testimony about all examinations of the
same condition." Fed. R. Civ. P. 35(b)(4). The foregoing
procedures apply "to an examination made by the parties' agreement,
unless the agreement states otherwise." Fed. R. Civ. P. 35(b)(6).

Importantly, "[t]he civil discovery process is to be engaged
in cooperatively." <u>Mills v. East Gulf Coal Preparation Co., LLC</u>,
259 F.R.D. 118, 130 (S.D.W. Va. 2009). "[T]he spirit of the
[Federal Rules of Civil Procedure (the "Rules")] is violated when

23

advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues . . . ." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment. "District courts enjoy nearly unfettered discretion to control the timing and scope of discovery." Hinkle v. City of Clarksburg, 81 F.3d 416, 426 (4th Cir. 1996); accord Cook v. Howard, 484 F. App'x 805, 812 (4th Cir. 2012) (observing that "[d]istrict courts are afforded broad discretion with respect to discovery").

### B. Motions to Compel

Although Rule 26 allocates "primary responsibility for conducting discovery" to litigants, Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment, Subdivision (g), it likewise "acknowledges the reality that [the discovery process] cannot always operate on a self-regulating basis," Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment, Subdivision (b). "The Rules thus afford a number of mechanisms for litigants to seek judicial intervention in discovery disputes, including authorizing '[a] party seeking discovery [to] move for an order compelling an answer, designation, production, or inspection.'" Kinetic Concepts, Inc. v. ConvaTec Inc., 268 F.R.D. 226, 243 (M.D.N.C. 2010) (quoting Fed. R. Civ. P. 37(a)(3)(B)). Federal Rule of Civil Procedure 37 ("Rule 37") allows such a motion when "a party fails to produce documents . . . as requested under [Federal] Rule [of Civil Procedure] 34 [(Rule 34")]," Fed. R. Civ. P. 37(a)(3)(B)(iv).

24

Motions under Rule 37 "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). By Local Rule, the Court will "consider motions and objections relating to discovery" only if "moving counsel files a certificate that after personal consultation and diligent attempts to resolve differences the parties are unable to reach an accord. The certificate shall set forth the date of the conference, the names of the participating attorneys, and the specific results achieved." M.D.N.C. LR 37.1(a). The party opposing discovery generally bears the burden on a motion to compel. Kinetic Concepts, 268 F.R.D. at 243-44 (collecting cases).[13]

Rule 35 separately provides a remedy when litigants fail to follow the prescribed procedure for disclosing an examiner's report regarding a party's at-issue physical condition. See Fed. R. Civ. P. 35(b)(5). In particular, "[t]he court on motion may order — on just terms — that a party deliver the report of [such] an

---

13 Despite that general rule, as mentioned above, Plaintiff and Abex share the burden here, insofar as Plaintiff must demonstrate applicability of Rule 26(b)(4)(D), and Abex must establish "extraordinary circumstances" warranting discovery of "facts known or opinions held by" another party's consulting expert. H/S Wilson Outparcels, 2018 WL 1528187, at *2.

25

examination.  If the report is not provided, the court may exclude the examiner's testimony at trial."  Id.[14]

## C. Expense-Shifting

Upon granting a motion to compel, or, "if the . . . requested discovery is provided after the motion was filed[,] the [C]ourt must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the . . . attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5)(A).  Only three exceptions apply to the foregoing mandate: "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust."  Id.  Likewise, if the Court denies the motion, the Court

> must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees.  But the court must not order this

---

14  "[H]owever, . . . [Rule 35] does not limit the court to exclusion of testimony as its only remedy."  1 James Wm. Moore et al., Moore's Federal Practice, § 35.12 (3d ed.) (citing Salvatore v. American Cyanamid Co., 94 F.R.D. 156 (D.R.I. 1982)); see also E.N. v. Susquehanna Twp. Sch. Dist., No. 1:09CV1727, 2011 WL 2600870, at *4-5 (M.D. Pa. June 29, 2011) (unpublished) (mandating disclosure of examiner's report after recognizing that exclusion under Rule 35(b)(5) provides "no sanction at all" when examining party intends not to call examiner at trial).

26

> payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(B).  Upon granting such motion in part and denying it in part, "the [C]ourt . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."  Fed. R. Civ. P. 37(a)(5)(C).

Rule 26 separately envisions expense-shifting when the Court allows a litigant to obtain discovery from another party's non-testifying expert under Rule 26(b)(4)(D).  More specifically, "[u]nless manifest injustice would result," Fed. R. Civ. P. 26(b)(4)(E), Rule 26 requires that "the party seeking discovery . . . pay the expert a reasonable fee for time spent in responding to discovery," id.  In addition, likewise barring "manifest injustice," id., the requesting party must "pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions," id.

## II. Analysis

### A. Preliminary Matters

The Court begins by addressing the notices by Federal Mogul, PACCAR, Eaton, Morse TEC, Ford, Meritor, and DCo, as well as the Motions to Join by Strick and Cummins.  Because Plaintiff has submitted an expert report from Holstein inculpating those Defendants in causing Decedent's mesothelioma (Docket Entry 194-1 at 5–18), they possess an interest in the Discovery Motion, which relates to a potential basis for challenging Holstein's opinions

27

(to include his criticism of one of Defendants' experts, Oury). Given that circumstance and Plaintiff's lack of opposition, the Court will grant the Motions to Join. <u>See generally</u> M.D.N.C. LR 7.3(k) ("If a respondent fails to file a response within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice.").

Next, the Court turns to two threshold issues regarding the procedure by which Abex sought relief and the grounds on which Abex has relied. First, Rule 37(a) authorizes a litigant to file a motion "[t]o [c]ompel a [d]iscovery [r]esponse," Fed. R. Civ. P. 37(a)(3)(B), and identifies four types of conduct that may prompt such motion, including "fail[ure] to produce documents . . . as requested under Rule 34," Fed. R. Civ. P. 37(a)(3)(B)(iv). By Local Rule, "[a]ny party seeking to compel discovery or other pretrial relief based upon discovery material which has not been filed with the clerk must identify the specific portion of the material which is directly relevant and ensure that it is filed as an attachment to the application for relief." M.D.N.C. LR 26.1(b)(3).

Here, Abex has failed to file a copy of the relevant discovery request, as required by Local Rule 26.1(b)(3). Although Abex has attached evidence demonstrating its repeated efforts to obtain materials or documents from Plaintiff, the record reveals no Rule

28

34 request for production and corresponding response.[15]  However,
Plaintiff has not opposed the Discovery Motion based on Abex's
apparent noncompliance with Local Rule 26.1(b)(3), despite lodging
another procedural challenge to the Discovery Motion.  (See Docket
Entry 231 at 8–9 (challenging timeliness of Discovery Motion).)
Accordingly, given that the record reveals the substance of Abex's
request and Plaintiff's position in response, the Court will
consider the Discovery Motion despite Abex's failure to attach the
pertinent discovery materials.[16]

Second, as already mentioned, Rule 26 provides two exceptions
to the general rule that a party may not obtain discovery from
another party's consulting expert: "(i) as provided in Rule 35(b);
or (ii) on showing exceptional circumstances under which it is
impracticable for the party to obtain facts or opinions on the same
subject by other means."  Fed. R. Civ. P. 26(b)(4)(D).

Here, the parties have addressed only the latter exception,
regarding whether the situation presents exceptional circumstances
warranting discovery from Gordon, Plaintiff's consulting expert.
Notwithstanding lack of discussion by the parties, however, the
Court notes that analysis of Decedent's lung tissue (for purposes

---

15  Indeed, it remains unclear whether Abex ever served such
request upon Plaintiff.

16  "The imposition of sanctions for violation of a local rule
is discretionary with the Court.  In considering the imposition of
sanctions, the Court may consider whether a party's failure was
substantially justified or whether other circumstances make the
imposition of sanctions inappropriate."  M.D.N.C. LR 83.4(b).

29

of identifying the cause of his mesothelioma) at least resembles a physical examination as contemplated by Rule 35. Because Abex failed to advance Rule 35(b) as an alternate basis for compelling the disclosure of Gordon's report, the Court declines to grant relief on that ground. However, in deciding whether the circumstances here qualify as exceptional, the Court will consider the extent to which such circumstances raise concerns typically present in the Rule 35 scenario.

### B. Timeliness

Plaintiff has contended that untimeliness defeats the Discovery Motion because Abex filed it on June 29, 2021, two days before discovery closed. (Docket Entry 231 at 8.) In response, Abex has maintained that its filing before the discovery deadline renders the Discovery Motion timely and has justified any delay on the grounds that Abex attempted to resolve the dispute informally, an option that Abex deemed viable even after Plaintiff's refusal, on May 7, 2021, to provide "materials reviewed or analyzed by [Gordon]" (Docket Entry 207-13 at 1). (See Docket Entry 232 at 2 (citing email from Abex's Counsel to Plaintiff's Counsel, dated June 4, 2021, requesting "filters/grids from [] Gordon" and tendering Bandli for late June deposition).) The record reflects no response from Plaintiff's Counsel on that occasion (see Docket Entry 232-1 at 1–7), and Abex has represented that "Plaintiff ignored [that] request[]" (Docket Entry 232 at 2).

30

"Rule 37 . . . does not specify a specific time limit for the filing of a motion to compel." <u>RDLG, LLC v. RPM Grp., LLC</u>, No. 1:10CV204, 2012 WL 3202851, at *1 (W.D.N.C. Aug. 6, 2012) (unpublished); <u>accord</u> <u>Lane v. Lucent Techs., Inc.</u>, No. 1:04CV789, 2007 WL 2079879, at *3 (M.D.N.C. July 13, 2007) (unpublished) ("Rule 37 . . . does not provide a time limit for when . . . a motion [to compel discovery] can be filed."). However, "[a]bsent a specific order from the Court in the scheduling order, a party must generally move to compel a party to comply with a discovery request prior to the close of discovery or the motion is untimely." <u>RDLG, LLC</u>, 2012 WL 3202851, at *1. Moreover, the time necessitated by a litigant's "attempt to resolve [a discovery] dispute out of court" may "partially excuse[]" a litigant's delay in "seeking judicial relief." <u>Byrnes v. Jetnet Corp.</u>, 111 F.R.D. 68, 71 (M.D.N.C. 1986).

The Court declines to treat the Discovery Motion as untimely. Neither Rule 37 nor the schedule jointly proposed by the parties (Docket Entry 76), which the Court (per the undersigned) adopted (Text Order dated Apr. 6, 2020), establishes a deadline for filing a motion to compel. Via the joint Rule 26(f) report, the parties agreed that

> [d]iscovery shall be deemed completed within the applicable deadline only if initiated at such time as to afford the responding party the full time provided under the [Rules], and the agreed upon procedures as set forth herein, in which to respond prior to the applicable deadline set forth in the discovery plan.

(Docket Entry 76 at 5.) To the extent that provision could support the supposed untimeliness of the Discovery Motion, the Court notes that Plaintiff served supplemental expert reports in May and June 2021, both of which criticized Oury's analyses. (See Docket Entry 194-1 at 1-3; Docket Entry 232-5 at 1-2.) Abex need not have anticipated the precise nature of that criticism, some of which may increase the value of Gordon's sample as rebuttal evidence (as more fully discussed in the following subsection). Given that circumstance and the fact that Abex sought relief during discovery within a few weeks of its most recent request for Gordon's report and/or materials, Plaintiff's timeliness-based argument does not warrant denial of the Discovery Motion.

## C. Exceptional Circumstances

According to Abex, Gordon's "[FBA], including the grids and filters [he] prepared for his analysis" (Docket Entry 207-1 at 5), remain subject to discovery because "Staggs, Plaintiff's selected expert, failed to divide the tissue equally as instructed (id. at 8), "leaving Abex with an inadequate and unequal share of the tissue" (id. at 7) and because Gordon thereafter performed destructive testing on his share of the material (id.). In response, Plaintiff has contended that (i) Bandli performed an adequate analysis (Docket Entry 231 at 9-10), (ii) the amount of tissue Oury received met his own admitted standards (id. at 9), (iii) Staggs divided the material in a fair and unbiased manner,

32

consistent with Defendants' protocol (<u>id.</u> at 10–12), and (iv) Abex

has failed to demonstrate exceptional circumstances (<u>id.</u> at 12–15).

Fairness considerations "underlie[] the treatment of discovery

of [consulting] experts," <u>Thuma v. PolyMedica Corp. Liberty Med.</u>

<u>Supply, Inc. (In re PolyMedica Corp. Sec. Litig.)</u>, 235 F.R.D. 28,

33 (D. Mass. 2007), insofar as "fairness requires that each side

fully prepare its own case and not try to benefit through discovery

from the other side's better preparation," <u>id.</u>  <u>See also</u> Fed. R.

Civ. P. 26 advisory committee's notes, 1970 Amendment, Subdivision

(b)(4) ("A party must as a practical matter prepare his own case in

advance of [obtaining discovery from testifying experts], for he

can hardly hope to build his case out of his opponent's experts.").

Other courts have identified four policy goals behind Rule

26(b)(4)(D)'s protection of consulting experts:

> (1) the interest in allowing counsel to obtain the expert
> advice they need in order [to] properly evaluate and
> present their clients' positions without fear . . .;
> (2) the view that each side should prepare its own case
> at its own expense; (3) the concern that it would be
> unfair to the expert to compel its testimony and also the
> concern that experts might become unwilling to serve as
> consultants if they suspected their testimony would be
> compelled; and (4) the risk of prejudice to the party who
> retained the expert as a result of the mere fact of
> retention.

<u>United States ex rel. Westrick v. Second Chance Body Armor, Inc.</u>,

288 F.R.D. 222, 227–28 (D.D.C. 2012) (quoting <u>Long Term Capital</u>

<u>Holdings, L.P. v. United States</u>, No. 01CV1290, 2003 WL 21269586, at

*2 (D. Conn. May 6, 2003) (unpublished)).

33

In light of those considerations, some courts have deemed Rule 26(b)(4)(D)'s protection inapplicable when a litigant "designate[s] an expert as testifying and then[,] after obtaining an unfavorable opinion, simply reclassif[ies] that expert as non-testifying to the detriment of the opposing side to avoid any negative consequences." Brigham Young Univ. v. Pfizer, Inc., No. 2:12MC143, 2012 WL 1029304, at *4 & n.31 (D. Utah Mar. 26, 2012) (unpublished) (characterizing strategy as impermissible sword-and-shield tactic that undermines truth-seeking objective of judicial system). When confronted with a litigant who attempts to change an expert's designation in that manner, in deciding the extent to which such expert remains shielded from discovery, some courts instead have applied "a balancing test similar to Federal Rule of Evidence 403." Layman v. Junior Players Golf Acad., Inc., 314 F.R.D. 379, 383 (D.S.C. 2016). In contrast, under "the 'majority rule,' . . . a party may re-designate an expert as non-testifying and thereby insulate the expert from deposition by other parties absent a showing of exceptional circumstances under Rule 26(b)(4)(D)." Id. (noting lack of binding authority and ultimately following "majority rule").

As for what qualifies as exceptional circumstances, courts have allowed discovery when a litigant performs destructive testing that deprives another party of the opportunity to conduct its own examination on that same material. For example, in a lawsuit concerning the failure of certain metal chain links, when a party's

34

non-testifying expert (prior to initiation of the lawsuit) conducted "hardness testing," thereby altering the tested material and limiting another party's ability to replicate the test, those circumstances entitled the requesting party to the results of that testing (but not the non-testifying expert's opinions based on those results). White v. Cooper Indus., Inc., No. Civ. 06-4272, 2008 WL 3245461, at *3-4 (D.S.D. Aug. 6, 2008) (unpublished).

Moreover, another court deemed circumstances exceptional when the parties had submitted a decedent's tissue samples to multiple experts in an attempt to discern whether mesothelioma caused the decedent's death. Coates v. AC & S, Inc., 133 F.R.D. 109, 110 (E.D. La. 1990). In that case, "the possibility of 'shopping' . . . tissue samples," id. by which either side could solicit and summarily discard opinions of "consulting" experts in search of one who could "render a definitive diagnosis favorable to their position," id. at 111, warranted disclosure under Rule 26(b)(4)(D). The Coates court noted that "the goal [of litigation] should be to seek the ultimate truth at issue," id. at 110, and compared the situation to a Rule 35(a) autopsy, the results of which an examiner would disclose to all sides, id. at 111. For those reasons, the Coates court ordered that any party could discover the results of any expert's review of a tissue sample, regardless of which party had sought the review, as long as the requesting party paid the consulting expert's "fee and expenses in connection with the preparation of his report." Id. In similar

35

fashion, another court ordered disclosure (under Rule 35) after noting the "unfair advantage" that the plaintiffs could obtain by avoiding disclosure of examinations concerning at-issue physical or mental conditions. In re Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 2018 WL 5669019, at *1-2 (E.D. La. Nov. 1, 2018) (unpublished).[17]

Finally, "[a] party may not use a privilege (or work product) as a shield during discovery and then hammer it into a sword for use at the trial." United States v. Duke Energy Corp., 208 F.R.D. 553, 558 (M.D.N.C. 2002). Although that principle derives from cases interpreting whether a party has waived the protections of the attorney-client privilege or work-product doctrine, Twigg v. Pilgrim's Pride Corp., No. 3:05CV40, 2007 WL 676208, at *8 (N.D.W. Va. Mar. 1, 2007) (unpublished) (collecting cases), the underlying fairness-based rationale applies with similar force in the exceptional-circumstances context, see In re Application of Chevron Corp. v. 3TM Consulting, LLC, No. H-10-134, 2011 WL 13135155, at *4 (S.D. Tex. Jan. 10, 2011) (unpublished) (characterizing "sword-shield doctrine" as consistent with Rule 26(b)(4)(D), insofar as both "[are] founded on principles of fairness").

Here, the circumstances qualify as exceptional, such that Abex may obtain some discovery from Gordon. As an initial matter, the

_____

17 In that case, the court deemed Rule 35 applicable after concluding that "that the doctors at issue [we]re not consulting experts" within the scope of Rule 26(b)(4)(D). Id. at *4.

36

Court notes that, although "Plaintiff has not 'changed her tune'" (Docket Entry 231 at 14) regarding the division of Decedent's pathology materials, she appears to have engaged in strategic behavior regarding Gordon's belated designation as a consulting expert.  More specifically, Plaintiff frustrated Abex's receipt of the materials Gordon analyzed by withdrawing him as a testifying expert, several weeks after tendering him for a deposition and just seven days before his scheduled deposition.  Although some courts have deemed such conduct grounds for requiring a less rigorous showing by the party seeking discovery (i.e., Rule 403 instead of exceptional circumstances), the Court nonetheless applies the latter, bearing in mind the fairness-based foundation of Rule 26(b)(4)(D).

Several factors, taken together, render the situation exceptional.  First, Gordon performed destructive testing on his share of the pathology materials such that Oury cannot replicate his analysis on that sample "to obtain facts or opinions on the same subject," Fed. R. Civ. P. 26(b)(4)(D)(ii).  Especially because the parties arranged for sharing the pathology materials pursuant to a protocol to ensure both sides a fair opportunity to perform an adequate analysis, the fact of destructive testing does not constitute exceptional circumstances on its own.  However, the protocol failed to fully achieve its purpose, insofar as it permits either interpretation the parties have advanced in connection with this dispute.  In other words, the protocol appears to contemplate

37

either allocating the _slides_ of lung tissue, such that Plaintiff and Abex receive equivalent types and amounts of material, or dividing the usable _tissue_ on each slide, to that same end. The protocol's use of the terms "equal" and "equivalent" does not identify either method as the obviously correct one. The Court discerns neither bias in Staggs's approach nor lack of reasonable diligence in Abex's failure to anticipate the instant disagreement and specify, in more precise terms, the prescribed method of division. The Court thus declines to treat the existence of the protocol as a categorical impediment to Abex's showing of exceptional circumstances.

Second, analysis of lung tissue resembles a Rule 35 physical examination, the results of which generally do not warrant secrecy. Even though Plaintiff has decried the application of "a blanket rule that all tissue digestion studies performed by one side in litigation are automatically discoverable by the other side, regardless of whether the expert performing such tests is a testifying expert" (Docket Entry 231 at 14), Rule 35(b) effectively mandates that exact result under analogous circumstances — reciprocal disclosure following an examination of an at-issue physical condition, Fed. R. Civ. P. 35(b)(1), (3). _See also_ _Leszynski v. Russ_, 29 F.R.D. 10, 13 (D. Md. 1961) (endorsing policy of "encourag[ing ] exchange of medical information"). That disclosure obligation applies by default to physical examinations by agreement (like the one here) unless the parties provide

38

otherwise, Fed. R. Civ. P. 35(b)(6); the record here reveals no such agreement (see Docket Entry 207-2 at 1; Docket Entry 207-3 at 1; Docket Entry 207-4 at 2).

However, aside from the fact that no party has mentioned the Rule 35(b) exception to Rule 26(b)(4)(D), the situation here presents an additional complication. An examined party only bears the obligation to share "like reports of all earlier or later examinations of the same condition" after requesting the examiner's report. Fed. R. Civ. P. 35(b)(3). Here, Abex produced the Oury Supplemental Report and the Bandli Report without any such request by Plaintiff, presumably pursuant to Rule 26(a)(2)(B).[18] In any event, the absence of the Rule 35(b)(3) trigger does not justify the imbalance of information between Abex and Plaintiff regarding Decedent's medical information. See Buffington v. Wood, 351 F.2d 292, 296–97 (3d Cir. 1965) (rejecting "technical" interpretation of Rule 35(b) in favor of flexible approach designed "to facilitate medical report exchange").

Third, although Plaintiff has insisted that Abex possessed an "adequate" opportunity to analyze Decedent's pathology materials, at the same time, Plaintiff (via experts Holstein and Maddox) has criticized the basis for Oury's causation opinion. Those

---

18    Under Rule 35, Plaintiff's deposition of Oury would effectuate a waiver of "any privilege [Decedent] may have — in th[is] action or any other action involving the same controversy — concerning testimony about all examinations of the same condition." Fed. R. Civ. P. 35(b)(4).

Case 1:20-cv-00098-LCB-LPA   Document 468   Filed 09/27/21   Page 39 of 43

criticisms relate (in part) to the size and/or quality of the samples Oury and Bandli analyzed. According to the Supplemental Holstein Report, Oury erred in identifying an alternate cause for Decedent's mesothelioma (i.e., a cause unrelated to Defendants' products) because Oury based that opinion on the single anthophyllite fiber Bandli had detected. (See Docket Entry 194-1 at 2-3.) In Holstein's view, that single fiber may not "indicate[] an elevated exposure greater than would be expected in ordinary residents of urban areas." (Id. at 3.) Similarly, Maddox highlighted the presence of a single anthophyllite fiber in Bandli's sample and noted that the analyses had achieved only minimum analytical sensitivity. (See Docket Entry 232-5 at 2.)

Oury himself recognized the "limited" significance in finding a single fiber (see Docket Entry 187-1 at 1), consistent with his deposition testimony (see Docket Entry 207-10 at 59-60). Moreover, Oury and Bandli agreed that larger samples can produce more reliable or representative results. (See Docket Entry 207-10 at 43, 58-60; Docket Entry 231-3 at 7-8, 14.) In that regard, the dueling sets of experts have espoused similar views about what factors can enhance or detract from the pertinent modes of analysis; however, despite that shared understanding, Plaintiff has attempted to block Abex's access to a larger sample that could address some of the very concerns that Plaintiff's experts have identified. That approach undermines "the goal . . . [of] seek[ing] the ultimate truth at issue," Coates, 133 F.R.D. at 110.

See also <u>See also</u> <u>id.</u> at 111 (explaining how decision to suppress testimony from consulting experts "who could not make a definitive diagnosis [of mesothelioma]" could mislead jury "regarding the truth of [the] plaintiff's condition").

For the foregoing reasons, Abex has demonstrated exceptional circumstances entitling it to discover "the grids and test results from [] Gordon" (Docket Entry 232 at 8). However, the Court discerns no need, exceptional or otherwise, for production of Gordon's <u>opinions</u> based on his analysis of his share of Decedent's pathology materials. (<u>See</u> <u>id.</u> at 7 (distinguishing filters of digested tissue from Gordon's "work product" and asserting entitlement to former).) To the extent Gordon prepared a report that contains his opinions, Plaintiff need not disclose that portion of the report. <u>See</u> <u>White</u>, 2008 WL 3245461, at *3-4 (allowing disclosure of underlying data but denying access to expert opinions because requesting party's "own experts can[] examine the data and reach an independent conclusion").

### D. Expense-Shifting

When the Court grants in part and denies in part a motion to compel, Rule 37 authorizes (but does not generally require) the Court to "apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(C). As explained in the foregoing subsection, the Court will grant the Discovery Motion only in part, such that Plaintiff must produce the materials Gordon analyzed but not such portions of his "fiber burden study" (Docket Entry 207 at 1), which

41

reflect any opinions he formed based on his analysis. Under the circumstances, the Court exercises its discretion not to order apportionment of the expenses incurred in litigating the Discovery Motion.

In contrast, Rule 26 provides that, "[u]nless manifest injustice would result, the [C]ourt <u>must</u> require that [Abex and the other Defendants who joined the Discovery Motion] . . . pay [Gordon] a reasonable fee for time spent in responding to discovery," Fed. R. Civ. P. 26(b)(4)(E)(i) (emphasis added), and "pay [Plaintiff] a fair portion of the fees and expenses it reasonably incurred in obtaining [Gordon]'s facts and opinions," Fed. R. Civ. P. 26(b)(4)(E)(ii). Abex has not addressed the issue (<u>see</u> Docket Entries 207, 232), and the record fails to demonstrate that requiring Abex and the other Defendants who joined the Discovery Motion to pay an equitable share of such fees and/or expenses would result in manifest injustice. Therefore, the Court will order the parties to confer regarding expense-shifting under Rule 26(b)(4)(E) and will resolve any disputes that thereafter remain regarding the amount of the payment due from Abex (and the other Defendants who joined the Discovery Motion).

<u>**CONCLUSION**</u>

Abex has demonstrated exceptional circumstances such that it may discover certain "facts known . . . by [Gordon]," Fed. R. Civ. P. 26(b)(4)(D), to include facts about the portion of Decedent's pathology materials that Gordon analyzed (and/or samples Gordon

42

prepared based on those materials). However, in the interest of fairness, Abex (and the other Defendants who joined the Discovery Motion) remain entitled only to Decedent's medical information, not any "opinions held by [Gordon]," id., based on such information.

**IT IS THEREFORE ORDERED** that the Motions to Join (Docket Entries 210, 214) are **GRANTED** and that the Discovery Motion (Docket Entry 207) is **GRANTED IN PART** and **DENIED IN PART** in that, on or before October 4, 2021, Plaintiff shall provide Abex (and the other Defendants who joined the Discovery Motion) with "the grids and test results from [] Gordon" (Docket Entry 232 at 8).

**IT IS FURTHER ORDERED** that the parties promptly shall confer in an attempt to reach agreement about the amount of fees and expenses due from Abex (and the other Defendants who joined the Discovery Motion) and, on or before October 11, 2021, shall file a Joint Notice either (A) stating that the parties have resolved the issue, or (B) setting out their respective positions regarding the amount due from Abex (and the other Defendants who joined the Discovery Motion).

**IT IS FURTHER ORDERED** that, upon the filing of the foregoing Joint Notice or the time for such filing, the Clerk shall refer this matter back to the undersigned for further action.

This the 27th day of September, 2021.

_/s/ L. Patrick Auld_
**L. Patrick Auld**
**United States Magistrate Judge**

43