IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAURA M. WALLS, *Individually* )
*and as Executor of the Estate* )
*of* ROBIE W. WALLS, )
            )
           Plaintiff, )
            )
          v. )            1:20-CV-98
            )
FORD MOTOR COMPANY, *et al.*, )
            )
          Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

     Plaintiff Laura Walls, individually and as executor of the estate of now deceased husband Robie Walls, asserts claims for Mr. Walls' alleged wrongful death from mesothelioma. (ECF No. 138 ¶¶ 1, 2.) Plaintiff's Second Amended Complaint ("Complaint") specifically alleges that Mr. Walls' cumulative exposure to asbestos as a result of acts and omissions of a number of Defendants and their defective products, individually and together, was a substantial factor in causing his mesothelioma and other related injuries and, therefore, is the legal cause of his injuries and damages under North Carolina law. (*Id.* ¶ 9.) The Complaint alleges the following causes of action: Defective Design, Failure to Warn, Breach of Implied Warranty, Gross Negligence, Conspiracy, and Loss of Consortium. (*Id.* ¶¶ 49–98.)

     Before the Court are seven individually filed Motions for Summary Judgment by the following Defendants: (1) Defendant Carlisle Industrial Brake & Friction, Inc. ("Carlisle"),

(ECF No. 295); (2) Defendant Strick Trailers, LLC ("Strick"), (ECF No. 247); (3) Defendant Pneumo Abex LLC ("Abex"), (ECF No. 293); (4) Defendant ZF Active Safety US, Inc. ("ZF"), (ECF No. 249); (5) Defendant Meritor, Inc. f/k/a ArvinMeritor, Inc. ("ArvinMeritor"), (ECF No. 271); (6) Defendant Ford Motor Company ("Ford"), (ECF No. 291); and (7) Defendant Navistar, Inc. ("Navistar"), (ECF No. 326.).

For the reasons stated herein, all seven summary judgment motions will be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation.  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quotations omitted).  The role of the court at summary judgment is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v.*

2

*Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324.

## II.     CAUSATION IN ASBESTOS ACTIONS

To show causation in an asbestos suit, a plaintiff must prove (1) "that he was actually exposed to the alleged offending products," *Smith v. Schlage Lock Co., LLC*, 986 F.3d 482, 487 (4th Cir. 2021) (quoting *Wilder v. Amatex Corp.*, 336 S.E.2d 66, 68 (N.C. 1985)), and (2) "that exposure . . . was a substantial factor causing the plaintiff's injury," *Finch v. Covil Corp.*, 972 F.3d 507, 512 (4th Cir. 2020) (citing *Seraj v. Duberman*, 789 S.E. 2d 551, 557–58 (N.C. Ct. App. 2016)). On summary judgment, plaintiff must present "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Id.* at 512–13 (quoting *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986)). This is not an exacting standard, but "a *de minimis* rule" that requires plaintiff to "prove more than a casual or minimum contact with" defendant's product. *Id.* at 513 (quoting *Lohrmann*, 782 F.2d at 1162).

Several Defendants argue that Plaintiff must prove causation through expert testimony. (*See* ECF Nos. 248 at 2–3; 250 at 9–10; 276 at 17.) However, the Fourth Circuit

has made clear that causation in asbestos cases may be established through direct or circumstantial evidence. *Pace v. Air & Liquid Sys. Corp.*, 642 F. App'x 244, 253 (4th Cir. 2016) (citing *Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225 (4th Cir. 1986)). Plaintiff must simply submit evidence "of a reasonable and rational nature upon which a jury can make the necessary inference that there is a causal connection between a defendant's action and a plaintiff's injury." *Prekler v. Owens-Corning Fiberglas Corp.*, 60 F.3d 824, *3 (4th Cir. 1995) (unpublished). The Fourth Circuit has found that testimony from a plaintiff's coworkers that plaintiff was exposed to asbestos "on a regular basis from 1952 to the 1970s" constituted "direct evidence" of causation. *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 (4th Cir. 1995).

## III. BACKGROUND

Plaintiff has offered evidence that is common to all Defendants and evidence that is unique to each Defendant. Evidence in common is included in this Part, while evidence unique to each individual Defendant is included in Part IV.

Plaintiff's evidence shows that Mr. Walls served in the Navy from 1955 to 1959, and then worked as a tractor-trailer[1] fleet mechanic for approximately 40 years from 1960 to 2002 at five different jobsites located primarily in North Carolina and Virginia. (Walls dep. I at 25:2-4, 54:10-24, 56:24.) His approximate employment history after the Navy is as follows: Mack Truck Company (1960–1962), Great Coastal Express ("Great Coastal") (1962–1964), Archie Motors Freight ("Archie's") (1964–1972), Adley Express/Yellow Freight Trucking, Richmond Va. (1972–1979), and Adley Express/Yellow Freight

---

[1] Tractor trailer trucks are commonly known as semi-trailers or eighteen wheelers. (*See* Walls dep. I at 57:4-18.) The truck is the "tractor" and the cargo box or platform it tows is the "trailer." (*Id.*)

Trucking, Charlotte NC, (1979–2002) (together, "Adley"). (*Id.* at 55:1–56:24, 183:19–184:2.)

As a fleet mechanic, Walls regularly performed maintenance on tractor-trailer brakes, clutches, and engines. (*Id.* at 66:2-5, 91:9–92:12, 96:12–99:11.) According to Walls, his brake replacement process remained substantially the same throughout his career. (*Id.* at 84:13–85:6, 115:20–116:4.) Tractors have either two or three axles, while most trailers have two axles, and each axle had two brake drums and four brake shoes with linings, for a total eight to twelve brake shoes per tractor and eight per trailer. (*Id.* at 61:12-19, 63:13-18, 64:2-5, 65:4-7.) His brake work generally involved removing old brake linings, blowing excess brake dust out of brake drums using compressed air, sanding new brakes to ensure a "firm fit against the drum," and installing the new brakes. (*Id.* at 68:19–69:3, 70:25–71:10, 80:4-13.) According to his testimony, cleaning brake drums took approximately five to fifteen minutes, while sanding new brakes took approximately ten to fifteen. (*Id.* at 92:24–93:5, 197:1-4, 235:4-9.) Both activities spread large amounts of visible dust, which Walls inhaled. (*Id.* at 69:13-18, 69:25–70:4, 72:17–73:10, 76:4-21, 235:18–236:4.) His clutch work generally involved removing the old clutch, cleaning dust and debris with compressed air, installing a new clutch, and cleaning his workstation. (*Id.* at 92:5-22, 95:11-20.) As with brakes, replacing clutches also created large clouds of dust according to Walls, which he inhaled. (*Id.* at 92:5-22, 95:24–96:2.) His engine work involved removing and replacing gaskets, which could take anytime from three minutes to an hour depending on the type of gasket. (*Id.* at 96:12-25, 98:15–99:11, 102:17–103:23.) His process for removing gaskets also remained substantially the same throughout his career. (*Id.* at 124:23–125:10.) Walls scraped, sanded, or drilled gasket material from the engine, which according to his

5

testimony created dust that he inhaled. (*Id.* at 102:2-8, 103:24–104:25, 105:6-14). Finally, Walls also inhaled dust while cleaning up brake, clutch, and gasket dust from his workstation after completing these repairs, which usually took approximately fifteen to twenty minutes. (*Id.* at 86:13-25, 87:9–88:6, 88:10–89:11.)

Plaintiff's expert, Christopher DePasquale, testifies that removing, cleaning, and replacing brakes as described by Walls can cause "significant airborne asbestos exposures [to] occur to the mechanic." (*See* DePasquale rep. at 22.)[2] Exposure is measured in fibers per cubic centimeter of air ("f/cc"). (*Id.*) According to DePasquale, a mechanic's exposure to asbestos while cleaning brake drums with compressed air can range from 6.6 to 29.8 f/cc, and peak concentrations of 87 f/cc can occur. (*Id.*; ECF No. 415-11 at 11 tbl. 3.) Filing down new brakes can cause exposure ranging from 0.1 to 0.9 f/cc. (DePasquale rep. at 24; ECF No. 415-15 at 501 tbl. 1.) Cleaning and replacing clutches can cause personal exposure of 2.25 f/cc, and scraping asbestos engine gaskets can create concentrations up to 2.6 f/cc. (DePasquale rep. at 25–26; ECF No. 415-13 at 19 tbl. 4). Sweeping asbestos dust at the end of a work shift "has been shown to cause exposures" of up to 1.7 f/cc. (DePasquale rep. at 22–23.) A study cited by DePasquale found that merely opening boxes that contain new brakes can expose airborne fiber concentration of up to 1.9 f/cc, (*id.* at 24), while minutes from an Asbestos Study Committee meeting state that opening a brake box can expose mechanics to concentrations in excess of 5.0 f/cc, (ECF No. 415-14 at 2.) By comparison, average levels of exposure that exceed 0.1 f/cc over eight-hours or 1.0 f/cc

---

[2] Plaintiff submitted published scientific studies to the same effect. (ECF Nos. 415-8 at 2–3; 415-9 at 3, 6; 415-11 at 11 tbl. 3, 415-13 at 4 tbl. 4).)

over thirty minutes are currently considered unsafe by the Occupational Safety and Health Administration ("OSHA").  29 C.F.R. § 1910.1001(c)(1)–(2).

Plaintiff's expert, Arnold Brody, testifies that exposure to asbestos can cause mesothelioma.  (Brody rep. ¶¶ 16–17.)  Mesothelioma is a cancer of the mesothelial cells that line the lung.  (*Id.* ¶ 16.)  Exposure to asbestos induces this cancer by creating genetic errors within a cell, causing it to "undergo neoplastic transformation and grow into a deadly tumor."  (*Id.* ¶ 17.)  Greater exposure to airborne asbestos leads to a greater risk of cancer.  (*Id.* ¶ 44.)

Walls was diagnosed with mesothelioma on September 8, 2019.  (ECF No. 415-17 at 8.)  He died from the disease on October 15, 2020.  (ECF No. 246-2.)

## IV.    DISCUSSION

While Defendants primarily contend in their supportive memoranda that Plaintiff cannot meet the threshold causation requirements for actionable asbestos exposure under North Carolina law, each Defendant raises slightly different arguments for why each is entitled to summary judgment.  The Court will therefore address each motion separately.

### A.    Defendant ZF Active Safety US, Inc.'s Motion (ECF No. 249)

ZF argues that Plaintiff has failed to create a genuine issue of material fact as to whether Plaintiff's illness was caused by his exposure to ZF's products.  (ECF No. 250 at 9–10.)  Specifically, ZF argues that Plaintiff's expert testimony showing specific causation is inadmissible and Plaintiff cannot prove causation without that testimony.  (*Id.*)

ZF is the successor in interest to Fruehauf, a trailer and component part manufacturer.  (ECF Nos. 138 ¶¶ 12, 35; 250-1 at 2.)  As discussed in more detail in Section IV.A, *supra*, Walls testified that he replaced brakes in Fruehauf trailers roughly 20 times each

7

year for nine years, from 1963 to 1972. (Walls dep. I at 159:22–160:15.) Walls used replacement brakes manufactured and supplied by Fruehauf. (*Id.* at 160:16-18.) Fruehauf used asbestos brake linings in all its brakes until the early 1980s and discontinued asbestos in 1987. (ECF Nos. 250-1 at 17; 250-4 ¶ 18; 250-5 at 3.)

A reasonable jury could conclude from this evidence that Walls' exposure to asbestos from ZF's products constituted a substantial cause of his mesothelioma. Plaintiff's evidence supports that Walls replaced brakes on Fruehauf trailers roughly 20 times each year for nine years and exclusively used Fruehauf brakes. Each brake job subjected Walls to "significant airborne asbestos exposures." Walls testified that cleaning brake dust from a brake drum created large clouds of dust, which he inhaled; as did filing brake pads, opening new boxes of brake linings, and cleaning his work area. These activities took between five and thirty minutes apiece. According to Plaintiff's published scientific studies and experts, DePasquale and Brody, these activities expose mechanics to high asbestos concentrations in excess of concentrations considered safe or permissible. Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced direct and regular exposure to asbestos from Fruehauf brake linings over the extended period of nine years.

In separate motions, ZF seeks to exclude Plaintiff's expert testimony other than that outlined in Part III, *supra*, which shows specific causation under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (ECF Nos. 251, 256, 258.) ZF argues that, because the expert testimony targeted by its *Daubert* motions is not admissible, Plaintiff cannot show causation. However, the direct and circumstantial evidence discussed herein—including general causation expert testimony to

which ZF has not objected—is sufficient on its own to create a genuine issue of material fact as to whether Strick's products were a substantial cause of Plaintiff's mesothelioma. Thus, the Court need not address ZF's *Daubert* motions at this time.

Therefore, ZF's Motion for Summary Judgment will be denied as to Plaintiff's product liability claims.

Finally, ZF moves for summary judgment on Plaintiff's claim for punitive damages. (ECF No. 250 at 7–9.)  Plaintiff does not oppose this portion of ZF's motion, (ECF No. 420 at 2 n.1), and the Court concludes that Carlisle is entitled summary judgment on the issue of punitive damages.  Thus, the Court will grant ZF's motion as to this claim.

### B.    Defendant Carlisle Industrial Brake and Friction, Inc.'s Motion, (ECF No. 295)

Defendant Carlisle manufactured and distributed brake linings to tractor-trailer manufacturers to be used as replacement parts.  (ECF No. 406-7 at 19:6-15, 34:1-4, 49:10-13.)  Carlisle argues that Plaintiff cannot produce evidence that Mr. Walls was exposed to asbestos fibers from a Carlisle asbestos containing product at a sufficient level to satisfy North Carolina's causation requirements and therefore has failed to create a genuine issue of material fact as whether Walls' illness was caused by his exposure to its products.  (ECF No. 296.)

According to Plaintiff's evidence, Carlisle was the sole manufacturer of brake linings for Fruehauf Trailer Corp. ("Fruehauf"), a trailer manufacturer, from 1959 to the mid-1970s.[3]  (ECF No. 406-5 at 39:7-16, 40:15-19, 62:10-14.)  Fruehauf resold those linings as

---

[3] Plaintiff has also offered evidence that Carlisle sold brake linings to Strick, another trailer manufacturer, from 1971 to 1976. (ECF No. 406-7 at 54:6–55:9.)  Carlisle was not the sole supplier

Fruehauf replacement parts to mechanics. (*Id.* at 40:5-10, 46:17-20.) Replacement brake linings came in a Carlisle box with a Fruehauf label. (*Id.* at 46:17-20.) All Carlisle brake linings contained asbestos until 1979. (ECF Nos. 406-6 at 11–12, 20; 406-7 at 25:11-14, 27:16-23.) Carlisle did not include any warning regarding asbestos with its brake liners until 1973. (ECF No. 406-6 at 13.)

Walls testified that while working as a fleet mechanic for Archie's Motor Freight he replaced brakes in Fruehauf trailers roughly 20 times each year for nine years, from 1963 to 1972.[4] (Walls dep. I at 159:22–160:15.) Walls was the sole or primary mechanic at Archie's and generally performed the work on these trailers alone. (*Id.* at 179:23–180:1, 181:1-7.) Walls further testified that in performing these brake jobs he always used Fruehauf-Carlisle manufactured replacement brakes (*Id.* at 160:16-18.)

A reasonable jury could conclude from this evidence that Walls' exposure to asbestos from Carlisle's products constituted a substantial cause of his mesothelioma. Plaintiff's evidence supports that all Fruehauf brake linings were manufactured by Carlisle and contained asbestos. And as mentioned in Section IV.A, *supra*, Walls replaced these linings on Fruehauf trailers approximately twenty times each year for nine years while working at Archie's. According to Plaintiff's evidence, each brake job subjected Walls to "significant airborne asbestos exposures." Walls testified that cleaning brake dust from a

---

of brake liners to Strick, however, and Plaintiff has not cited evidence from which a reasonable jury could infer what portion of the Strick brakes Walls replaced contained Carlisle brake liners.

[4] Carlisle argues that Walls was referring to other trailers, not Fruehaufs, when he said he worked on 20 per year. (ECF No. 452 at 3–4.) However, to the question "did you work on one of those manufacturers more than another" during that time period, Walls responded "No. . . . They averaged out." (Walls dep. I at 160:8-12.)

brake drum created large clouds of dust, which he inhaled; as did filing brake pads, opening new boxes of brake linings, and cleaning his work area. These activities took between five and thirty minutes apiece. According to Plaintiff's published scientific studies and experts, DePasquale and Brody, these activities expose mechanics to high asbestos concentrations in excess of concentrations considered safe or permissible. Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced direct and regular exposure to asbestos from Carlisle brake linings over the extended period of nine years. Therefore, Carlisle's Motion for Summary Judgment will be denied as to Plaintiff's product liability claims.

Carlisle also moves for summary judgment on Plaintiff's claim for punitive damages. (ECF No. 296 at 17–20.) Plaintiff does not oppose summary judgment on this claim, (ECF No. 406 at 2 n.1), and the Court concludes that Carlisle is entitled summary judgment on the issue of punitive damages. Accordingly, the Court will grant Carlisle's motion as to this claim.

### C. Defendant Strick Trailers, LLC ("Strick"), (ECF No. 247)

Strick first argues that Plaintiff has failed to create a genuine issue of material fact as to whether Walls' illness was caused by his exposure to Strick's products. (ECF No. 248 at 2–5.)

Strick manufactures trailers and their component parts. (Walls dep. I at 112:10-17.) Walls recalled that he worked on Strick trailers throughout his career. (*Id.* at 130:6-16, 149:17-24, 189:6-17.) At Great Coastal from 1963–1964 and Archie's from 1964–1972, he

11

estimated that he replaced brakes on approximately twenty Strick trailers each year.[5] (*Id.* at 160:7-18; Walls dep. II at 174:13–175:7.)  He used Strick brakes in about half of replacements while at Great Coastal and a majority while at Archie's.  (Walls dep. I at 158:19–159:7, 161:8-12.)  At Adley from 1972–2002, he estimated that he replaced brakes on approximately thirty Strick trailers each year.  (Walls dep. II at 175:8-21.)  He only used Strick-manufactured replacement brakes at Adley.  (Walls dep. I at 192:13-17.)  At each job, virtually all of the used brakes Walls removed had originally been installed by him or a coworker, meaning that many—if not most—of the old brakes he removed from Strick trailers were also manufactured by Strick.  (*Id.* at 181:1-15; Walls dep. II at 198:25–199:12.)  Strick's brakes were made with asbestos until 1984.  (ECF No. 415-6 at 56:11-13, 57:6-10, 114:1-6, 116:9-19.)

A reasonable jury could conclude from this direct and circumstantial evidence that Walls' exposure to asbestos from Strick's products constituted a substantial cause of his mesothelioma.  Walls estimated that he replaced brakes on Strick trailers approximately 20 times each year for more than a decade, and a majority of the used brakes he removed and new brakes he installed were manufactured by Strick as well.  Each brake job subjected Walls to "significant airborne asbestos exposures."  Walls testified that cleaning brake dust from a brake drum created large clouds of dust, which he inhaled; as did filing brake pads, opening new boxes of brake linings, and cleaning his work area.  These activities took between five and thirty minutes apiece.  According to Plaintiff's expert and scientific

---

[5] Strick argues that Walls "can only recall performing one or two brake jobs on Strick trailers." (ECF No. 248 at 2.)  While Walls did testify that he only recalled replacing the *original* brakes on one or two Strick trailers, he testified that his total work with Strick trailers included between 20 and 30 replacements per year.  (Walls dep. I at 160:7-18; Walls dep. II at 174:13–175:7.)

evidence, these activities expose mechanics to high asbestos concentrations in excess of concentrations considered safe or permissible. Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced direct and regular exposure to asbestos from Strick's products over the extended period of nine years.

In separate motions, Strick seeks to exclude Plaintiff's expert testimony showing specific causation under Rule 702 of the Federal Rules of Evidence and *Daubert*. (ECF Nos. 237, 239, 243.) Strick argues that, because this expert testimony is not admissible, Plaintiff cannot show causation. However, the direct and circumstantial evidence discussed herein—including general causation expert testimony to which Strick has not objected—is sufficient on its own to create a genuine issue of material fact as to whether Strick's products were a substantial cause of Plaintiff's mesothelioma. Thus, the Court need not address Strick's *Daubert* motions at this time.

Next, Strick argues that it is entitled to summary judgment because Walls' injuries were caused by "after-market component[s] installed on its product." (ECF No. 248 at 5–7.) Specifically, it argues that the installation of brakes manufactured by third parties constituted an alteration or modification of its trailers, absolving it of liability under North Carolina law. (*Id.*)

Under North Carolina law, a manufacturer cannot be held liable for injuries proximately caused by "alteration or modification of the product" by a third party. N.C. Gen. Stat. § 99B-3(a). Not every change is an "alteration or modification," however. § 99B-3(b). The statute reaches only changes in the "design, formula, function, or use of the product from that originally designed, tested, or intended by the manufacturer." *Id.* When

the change "was in accordance with the instructions or specifications" of the manufacturer, he will not escape liability. § 99B-3(a)(1). The manufacturer bears the burden to show that an alteration or modification within the scope of the statute proximately caused the injury. *See Stark ex rel. Jacobsen v. Ford Motor Co.*, 723 S.E.2d 753, 763 (N.C. 2012) (Hudson, J., concurring in part and dissenting in part).

Here, Strick designed its trailers with asbestos brakes. Walls testified that many of the brakes he removed from and installed in Strick trailers were manufactured by Strick. Further, those aftermarket brakes that were not manufactured by Strick were designed in accordance with Strick's specifications. Strick has not identified any "alteration or modification" in the aftermarket brakes that proximately caused Walls' illness. Certainly, Strick cannot claim that a third-party's use of asbestos in its brakes changed the design, formula, function, or use of its trailers when it used asbestos in its brakes as well. Thus, Strick has failed to demonstrate that an alteration or modification proximately caused Walls' illness.

Strick's Motion for Summary Judgment will be denied with respect to Plaintiff's product liability claims.

Finally, Strick moves for summary judgment on Plaintiff's claim for loss of consortium. (ECF No. 248 at 10–11.) Plaintiff does not oppose this portion of Strick's motion. (ECF No. 415 at 28.) Plaintiff filed her loss of consortium claim while her husband was still alive; now that he has passed, this claim is encompassed by her wrongful death claim and can be dismissed. *See Keys v. Duke Univ.*, 435 S.E.2d 820, 822 (N.C. Ct. App. 1993). Plaintiff similarly does not oppose Strick's motion as it relates to her claim for punitive damages. (ECF No. 415 at 2 n.1.) Because the Court concludes that Strick is

14

entitled to judgment as a matter of law with respect to Plaintiff's claims for loss of consortium and punitive damages, the Court will grant Strick's motion as to these claims.

### D.     Defendant Pneumo Abex LLC's ("Abex") Motion, (ECF No. 293)

Abex argues that Plaintiff has failed to create a genuine issue of material fact as to whether Walls' illness was caused by his exposure to Abex's products. (ECF No. 294 at 8–11.) Specifically, Abex argues that (1) Plaintiff has not shown that Walls was actually exposed to Abex products, and (2) Plaintiff has not shown that Abex products were a substantial cause of Walls' illness. (*Id.*)

Abex manufactured brake linings sold by another company under the brand name "Rayloc." (ECF No. 412-6 at 72:11-23, 79:3-8.) Rayloc manufactured and sold rivetted brakes. (Walls dep. I at 201:14–202:15.) Walls testified that he installed Rayloc rivetted brakes on tractors while at Archie's from 1964 to 1972. (*Id.*; Walls dep. II at 14:12-18.) During this time, according to Walls, he removed and installed rivetted brakes about fifty to seventy-five times each year, half of which were Rayloc brakes. (Walls dep. II at 13:19–14:18.) Riveted brakes required additional work to remove and install brake linings. (Walls dep. I at 77:1–78:4.) Walls would punch six holes in each lining and attach each to a brake with rivets, which took approximately five minutes per lining. (*Id.*; Walls dep. II at 50:16–51:1.) Removing linings from riveted brakes also proved more complicated according to Walls, requiring him to chisel or drill off old linings and sand the brake surface smooth. (Walls dep. I at 83:6–84:2; Walls dep. II at 51:3–52:25.) This process created dust and debris, which Walls inhaled. (Walls dep. I at 78:5-13; 83:12–84:12.) According to DePasquale, Plaintiff's expert, carving rivets into brake linings can cause exposures up to 3.5 f/cc. (DePasquale rep. at 24.)

Abex supplied the "vast majority" of brake linings for Rayloc brakes through the 1970s. (ECF Nos. 412-7 at 34:7-16; 412-8 at 69:18-25.) All brake linings sold by Abex to Rayloc contained asbestos until the 1980s. (ECF No. 412-7 at 34:24–35:14.)

A reasonable jury could conclude from this evidence that Walls' exposure to asbestos from Abex's products constituted a substantial cause of his mesothelioma. Plaintiff's evidence supports that Walls replaced Rayloc rivetted brakes roughly twenty times each year for seven years, and that the "vast majority" of these used asbestos brake liners manufactured by Abex. Each brake replacement involved scraping and cleaning brake residue; opening, sanding, puncturing, and attaching replacement brake liners; and cleaning his workstation. Each activity took between five and thirty minutes apiece and created visible clouds of brake dust, which Walls inhaled. According to Plaintiff's published scientific studies and experts, DePasquale and Brody, these activities subjected Walls to "significant airborne asbestos exposures." Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced direct and regular exposure to asbestos from Abex rivetted brake linings over the extended period of seven years. Therefore, Carlisle's Motion for Summary Judgment will be denied as to Plaintiff's product liability claims.

Abex points to *Cox v. AGCO Corp.*, No. 4:16-CV-00084-M, 2020 WL 3473636 (E.D.N.C. June 25, 2020), to argue that Plaintiff's case against Abex rests on speculation and conjecture. (ECF No. 294 at 9 n.1); *Cox*, 2020 WL 3473636, at *7. In *Cox*, the evidence showed only that Rayloc was "[o]ne brand of brakes . . . available for sale" at a store where the decedent purchased an unknown number of brakes, and there was no evidence of how often Rayloc brakes were used by the decedent nor what level of exposure the decedent

16

sustained. *Cox*, 2020 WL 3473636, at *2. Here, by contrast, Plaintiff has presented direct evidence that Walls used Rayloc brakes on a regular basis over the extended period of seven years and expert testimony that each brake replacement likely exposed Walls to high concentrations of asbestos. Thus, the only inference necessary in this case is that Abex, which manufactured the "vast majority" of Rayloc brake liners, manufactured more than a casual or minimum number of liners used by Walls. This is a reasonable inference given the evidence in this case and therefore must be resolved in in Plaintiff's favor.

Thus, Abex's Motion for Summary Judgment will be denied.

### E. Defendant Meritor, Inc. f/k/a ArvinMeritor, Inc.'s Motion, (ECF No. 271)

ArvinMeritor is the successor in interest of Rockwell International Corp. ("Rockwell"), an automotive products supplier. (ECF Nos. 138 ¶ 28; 276-5 at 1 n.1.) ArvinMeritor argues that it is entitled to judgment as a matter of law because: (1) Rockwell was not a manufacturer of asbestos products; (2) Walls was not actually exposed to asbestos by Rockwell; (3) Walls modified and altered Rockwell brakes, barring Plaintiff's claims; (4) Plaintiff cannot meet her burden on her Failure to Warn claim; (5) Plaintiff cannot meet her burden on her Breach of Implied Warranty claim; (6) Plaintiff cannot establish causation through expert testimony; and (7) Plaintiff cannot sustain her claim for punitive damages. (ECF No. 276.)

Rockwell manufactured and distributed riveted tractor brakes. (Walls dep. I at 202:7-15.) Walls testified that he replaced Rockwell brakes while working at Archie's from 1964 to 1972. (*Id.*; Walls dep. II at 14:12-18.) During this time, Walls removed and installed rivetted brakes about fifty to seventy-five times each year, half of which were Rockwell

brakes. (Walls dep. II at 13:19–14:18.) According to ArvinMeritor, Rockwell did not manufacture brake linings. (ECF No. 276-6 ¶ 4.) Rockwell did include brake linings procured from third parties in its brakes and sold them under the Rockwell name. (*Id.*) Rockwell also resold "small numbers" of brake linings as replacement parts. (*Id.*) All brake linings sold by Rockwell included asbestos until the 1980s. (ECF No. 416-6 at 20:19-25.)

### 1. Rockwell is a "manufacturer" under North Carolina law

ArvinMeritor first moves for summary judgment on Plaintiff's Defective Design claim because Rockwell did not manufacture the brake liners that contained asbestos. (ECF No. 276 at 8–11.)

Under North Carolina law, a manufacturer is one "who designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product prior to its sale to a user or consumer." N.C. Gen. Stat. § 99B-1(2). A manufacturer has a duty to inspect or test its products, "which includes [the] duty to inspect products manufactured by another which are component parts of the product produced by the manufacturer." *Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.*, 530 S.E.2d 321, 326 (N.C. Ct. App. 2000). "[A] manufacturer who incorporates a defective component part into its finished product and then places the finished product into the stream of commerce is liable for injuries caused by a defect in the component part." *Harris v. Ajax Boiler, Inc.*, No. 1:12-CV-00311-MR-DLH, 2014 WL 3101941, at *6 (W.D.N.C. July 7, 2014) (citing *Baughman v. Gen'l Motors Corp.*, 780 F.2d 1131, 1132 (4th Cir. 1986)). "The fact that the manufacturer or assembler did not actually manufacture the component part is irrelevant." *Baughman*, 780 F.2d at 1132 (applying South Carolina law). Instead, "the plaintiff must be able to show that the defendant sold or exercised control over the defective product." *Id.*

18

Here, Rockwell designed, produced, and assembled brakes. It installed brake liners as a component part of those brakes. Thus, Rockwell was a "manufacturer" of those brakes under North Carolina law and had a duty to inspect the brake liners it incorporated into its completed brakes. The fact that Rockwell did not manufacture the component part is "irrelevant." Therefore, ArvinMeritor has failed to demonstrate that it is entitled to summary judgment on this ground.

2.    Plaintiff's evidence shows actual exposure to Rockwell's asbestos products

ArvinMeritor next argues that Plaintiff cannot show that Walls was actually exposed to asbestos from Rockwell's products because Walls lacked personal knowledge of whether the brakes he installed were manufactured by Rockwell or contained asbestos. (ECF No. 276 at 11–13.)

To show causation in an asbestos suit, a plaintiff must prove "that he was actually exposed to the alleged offending products." *Schlage Lock*, 986 F.3d at 487 (quoting *Wilder*, 336 S.E.2d at 68). Where a plaintiff is unable to provide evidence that he was exposed to asbestos from a defendant's product, the defendant is entitled to summary judgment. *Id.* at 489. "Bare beliefs" that a plaintiff was exposed to asbestos, "even alongside evidence that some products may have had asbestos in them, simply is not enough evidence to create a genuine dispute of material fact." *Id.* at 488–89 (alteration marks omitted).

Here, Walls testified to installing Rockwell brakes in tractors at Archie's. He testified to knowing that the brakes were made by Rockwell because Rockwell was printed on the box and on brake linings. (Walls dep. I at 155:23–156:6; Walls dep. III at 122:3-6.) He testified that he was responsible for much of the purchasing while at Archie's and "had a

19

general idea" of parts purchased by the shop. (Walls dep. II at 135:20–136:6.) He also testified that the brakes he removed were Rockwells. This conclusion was not a "bare belief," but an inference based on the fact that Walls was the sole or principal mechanic working on the fleet of tractors during this time and had personal knowledge about the brakes that were installed in each tractor. (*See* Walls dep. I at 179:23-180:1, 181:1-7, 199:8-10, 202:16-203:1; Walls dep. II at 124:21–125:8). Finally, ArvinMeritor admitted in deposition that all of its brakes contained asbestos during the relevant time period. (ECF No. 416-6 at 20:19-25.) Thus, the fact that Walls was not personally aware at the time that the brakes contained asbestos is not dispositive.

A reasonable jury could find that Plaintiff was actually exposed to asbestos from Rockwell's products. Thus, ArvinMeritor is not entitled to summary judgment on this ground.

3.  ArvinMeritor has not shown that Walls' filing of brake liners was the proximate cause of his injury

ArvinMeritor next argues that Walls altered or modified its brake liners by sanding them and, therefore, ArvinMeritor is entitled to judgment as a matter of law. (ECF No. 276 at 13–15.)

To hold a manufacturer liable for either inadequate design or failure to warn, a plaintiff must show that the manufacturer proximately caused plaintiff's injuries. N.C. Gen. Stat. §§ 99B-5(a), 6(a); *DeWitt v. Eveready Battery Co.*, 550 S.E.2d 511, 517 (N.C. Ct. App. 2001), *aff'd*, 565 S.E.2d 140 (N.C. 2002). "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injures, and without which the injuries would not have occurred." *Hairston v. Alexander*

*Tank & Equip. Co.*, 311 S.E.2d 559, 565 (N.C. 1984). A manufacturer cannot be held liable for injuries proximately caused by "alteration or modification of the product" by a third party. § 99B-3(a). An alteration or modification is a change "in the design, formula, function, or use of the product from that originally designed, tested, or intended by the manufacturer." § 99B-3(b). As mentioned above, the manufacturer bears the burden to show that an alteration or modification within the scope of the statute proximately caused the injury. *See Stark*, 723 S.E.2d at 763 (Hudson, J., concurring in part and dissenting in part).

Here, ArvinMeritor has failed to present sufficient evidence to support that Walls' injuries were proximately caused by sanding brake linings. Even assuming, without finding, that sanding the brakes constituted an "alteration or modification," Plaintiff's evidence supports that such sanding exposed Walls to asbestos concentrations of no more than 0.9 f/cc. Every other activity described by Walls—cleaning brake drums, opening new brakes, drilling rivets, and sweeping his workstation—exposed Walls to higher concentrations of asbestos. Moreover, ArvinMeritor's own expert reported that sanding brakes creates exposures that are "still below 0.1 f/cc as a time-weighted average." (ECF No. 276-7 at 11.) Thus, ArvinMeritor has failed to show that it is entitled to summary judgment on these grounds.

4. <u>A genuine issue of material fact exists as to whether Rockwell's warnings were defective</u>

ArvinMeritor next argues that it is entitled to summary judgment on Plaintiff's Failure to Warn claim. (ECF No. 276 at 15–16.)

21

Under North Carolina law, product liability claims for failure to warn sound in negligence. *Lightfoot v. Ga.-Pac. Wood Prod., LLC*, 441 F. Supp. 3d 159, 170 (E.D.N.C. 2020) (citing *Stegall v. Catawba Oil Co. of N.C.*, 133 S.E.2d 138 (N.C. 1963)), *aff'd*, 5 F.4th 484 (4th Cir. 2021). To maintain such a claim, a plaintiff must show: (1) the manufacturer acted unreasonably in failing to provide an adequate warning; (2) that failure was a proximate cause of the harm; and (3) the manufacturer knew, became aware, "or in the exercise of ordinary care should have known" that the product "posed a substantial risk of harm to a reasonably foreseeable claimant." § 99B-5(a)(1). A manufacturer has a duty under this standard to "perform reasonable tests and inspections to discover latent hazards" and "provide warnings of any danger associated with the product's use [that are] sufficiently intelligible and prominent to reach and protect all those who may reasonably be expected to come into contact with the product." *Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 992 (E.D.N.C. 2015) (quoting *Nicholson v. Am. Safety Util. Corp.*, 476 S.E.2d 672 (N.C. Ct. App. 1996), *aff'd as modified*, 488 S.E.2d 240 (N.C. 1997)).

Here, pursuant to the first element, Rockwell failed to include any warning of the risks of asbestos in its products until the late 1970s, after Walls stopped regularly installing its brakes. (ECF No. 276-5 at 18.) As a consequence, pursuant to the second element, Walls did not know that the brakes he installed contained asbestos or that the brake dust posed a risk to his health. (*See* Walls dep. III at 127:20–128:4.) Pursuant to the third element, Plaintiff has offered evidence that the serious health risks posed by asbestos in brakes was discovered as early as 1932. (*See* ECF No. 416-28 at 4.) In 1948, the National Safety Council ("NSC") informed its members that "[a]sbestos used in the formulation of brake lining is a potentially harmful compound" and that there is a risk from "slitting,

22

grinding, or surfacing" the linings. (ECF No. 416-27 at 13.) ArvinMeritor was a member of the NSC from 1942 to 1999 and presumably received this publication. (ECF No. 276-5 at 7.) Taking this evidence in the light most favorable to Plaintiff, ArvinMeritor knew or reasonably should have known that asbestos posed a risk to mechanics, failed to include a warning, and consequently caused Walls' injuries. Thus, ArvinMeritor's motion for summary judgment as to this claim will be denied.

     5.    <u>A genuine issue of material fact exists as to whether Rockwell breached the implied warranty of merchantability</u>

ArvinMeritor next contends that it is entitled to summary judgment on Plaintiff's Breach of Implied Warranty claim. (ECF No. 276 at 16–17.) Specifically, it argues that its brakes were not defective at the time they were sold. (*Id.*)

A Breach of Implied Warranty claim has four elements: (1) existence of an implied warranty; (2) defect; (3) cause; and (4) damages. *Goodman v. Wenco Foods, Inc.*, 423 S.E.2d 444, 447–48 (N.C. 1992). A product is defective if it fails one of six criteria, including if it is not "fit for the ordinary purposes for which such goods are used" or is not "adequately contained, packaged, and labeled as the agreement may require." § 25-2-314(2)(c), (e). Failure to adequately warn may constitute a defect. *Bryant v. Adams*, 448 S.E.2d 832, 842 (N.C. Ct. App. 1994); *Reid v. Eckerds Drugs, Inc.*, 253 S.E.2d 344, 349 (N.C. Ct. App. 1979). Similarly, a product may be defective where it can cause injury even if "being used for its intended purposes in a normal way." *Reid*, 253 S.E.2d at 350. Whether a product is defective is ultimately a question of fact for the jury. *Id.*

Here, as described above, Plaintiff has presented evidence that Rockwell's brakes posed a health hazard to Walls through ordinary use. ArvinMeritor's own expert admits

that removing used Rockwell brakes and cleaning brake drums exposes mechanics to asbestos, (ECF No. 276-7 at 11), and Plaintiff's evidence, detailed above, shows that other ordinary activities—such as opening boxes, attaching brake linings to rivetted brakes, and sweeping a workstation—also expose mechanics to high levels of asbestos. Further, Rockwell did not include any warnings with its products during the time Walls regularly installed Rockwell brakes. Thus, a reasonable jury could find that Rockwell's brakes were defective in breach of the implied warranty of merchantability. ArvinMeritor's motion for summary judgment on this claim will be denied.

6. <u>A reasonable jury could find that Rockwell's brakes were a substantial cause of Walls' mesothelioma</u>

ArvinMeritor next argues that Plaintiff cannot establish that Rockwell's brakes caused his mesothelioma. (ECF No. 276 at 17.) In separate motions, ArvinMeritor seeks to exclude Plaintiff's expert testimony showing specific causation under Rule 702 of the Federal Rules of Evidence and *Daubert*. (ECF No. 269; *see* ECF No. 339.) It argues that, because this expert testimony is not admissible, Plaintiff cannot show causation. However, Plaintiff has produced direct evidence that Walls was exposed to asbestos from Rockwell's products on a regular basis over an extended period of seven years. Walls testified that he replaced Rockwell brakes roughly eighteen to twenty times each year. Each brake job involved scraping and cleaning off old brakes; opening, sanding, drilling, and installing new brakes; and sweeping his workstation—activities that create high levels of asbestos exposure according to the general causation testimony of DePasquale and Brody, to which ArvinMeritor has not objected. Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced

direct and regular exposure to asbestos from Rockwell's products over the extended period of seven years. Therefore, the Court need not address ArvinMeritor's *Daubert* motions at this time and ArvinMeritor's Motion for Summary Judgment will be denied as to Plaintiff's product liability claims

       7.    <u>Plaintiff has abandoned her punitive damages claim</u>

Lastly, ArvinMeritor moves for summary judgment on Plaintiff's claim for punitive damages. (ECF No. 276 at 17–19.) Plaintiff does not oppose this portion of ArvinMeritor's motion, and the Court concludes that ArvinMeritor is entitled to summary judgment on Plaintiff's punitive damages claim. (ECF No. 416 at 2 n.1, 29.) Thus, the Court will grant ArvinMeritor's motion as to this claim.

**F.    Defendant Ford Motor Company's Motion (ECF. No. 291)**

       1.    <u>A reasonable jury could find that Ford's products were a substantial cause of Walls' mesothelioma</u>

Ford first argues that Plaintiff has failed to create a genuine issue of material fact as to whether Plaintiff's illness was caused by his exposure to Ford's products. (ECF No. 292 at 6–12.)

Walls performed this maintenance on tractors manufactured by Ford during his career. (Walls dep. I at 109:13-16.) While at Archie's from 1964–1972, Walls performed virtually all mechanic work for a fleet of tractor-trailers that, from about 1966–1972, included four Ford tractors. (*Id.* at 148:12-15; Walls dep. III at 82:2-21, 85:5-10; ECF Nos. 463-6 at 11:14–12:4; 463-7.) While at Adley from 1977 to 2002, one sixth of his tractor

work involved Ford trucks.[6]  (Walls dep. I at 186:12–187:9, 193:24–194:1, 212:9-12, 227:10-19; Walls dep. III at 21:16-24.)  At Adley, Ford manufactured the replacement brakes and clutches Walls removed from and installed in Ford trucks as well.  (Walls dep. I at 212:18–213:10, 214:20–215:6, 234:8-11, 246:7-15; Walls dep. III at 101:23–103:12.)  His replacement gaskets were obtained either from Ford or directly from the third-party manufacturer of the engines used in Ford trucks.  (Walls dep. I at 171:24–172:4.)

While at Adley from approximately 1966 to 1972, Walls changed brakes on each Ford tractor at least once each month, (*Id.* at 176:19–177:10), and changed the clutch one each year, (Walls dep. III at 86:11-23).  He performed about ten gasket jobs per month, a minority of which were on Ford tractor engines.  (Walls dep. I at 177:22-178:7.)  In 1977 and 1978, Walls performed roughly 50–60 brake jobs, 40–60 clutch jobs, and 50–75 gasket jobs on tractors each year—one-sixth of which were on Ford trucks.  (*Id.* at 213:25–214:4, 222:14-23; Walls dep. II at 15:18–16:1.)  From 1979 to 2002, he performed approximately 100–120 brake jobs, 40–50 clutch jobs, and 120 gasket jobs each year.  (Walls dep. I at 232:18–233:4, 245:18–246:1, 251:14-24; Walls dep. II at 16:7-18, 23:14-23.)  Again, roughly one-sixth of these were on Fords.  (Walls dep. I at 211:23–212:12.)

All Ford brakes contained asbestos until 1982, (ECF No. 463-10 at 41:5-19), and Ford continued to sell asbestos-containing brakes until 1990, (ECF No. 463-6 at 71:6-23).  Ford's clutches contained asbestos until 1984.  (ECF No. 463-5 at 13.)  All Ford gaskets

---

[6] Ford argues that there were "very few Fords" in the fleet.  (ECF No. 292 at 4; *see* Walls dep. I at 213:9-10.)  On summary judgment, however, the Court must take the evidence in the light most favorable to Plaintiff.  *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).  Resolving Walls' conflicting testimony in Plaintiff's favor supports that one-sixth of Walls' tractor work while at Adley was on Fords.  (*See* Walls dep. I at 212:9-12.)

contained asbestos until 1988, and some replacement gaskets contained asbestos until 1990. (ECF Nos. 463-36 at 158:14–159:4; 463-37; 463-38 at 52:8–53:14.)

A reasonable jury could conclude from this evidence that Walls' exposure to asbestos from Ford's products constituted a substantial cause of his mesothelioma. Walls performed some repairs on Fords from 1966 to 1973 and multiple monthly repairs from 1977 to 2002. He testified that each of these repairs created clouds of dust, which he inhaled. Until Ford phased out use of asbestos, each repair was of a kind that, according to Plaintiff's experts, subjected mechanics to "significant airborne asbestos exposures." Ford began phasing out asbestos in the early 1980s but continued to sell some asbestos-containing products into 1990, and Walls continued to remove asbestos-containing brakes, clutches, and gaskets from old trucks after these products were phased out on new models. Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced direct and regular exposure to asbestos from Ford products over an extended period.

Ford argues that any exposure Walls sustained from its products was "dwarfed" by his exposure from other sources. (ECF No. 292 at 10 (quoting *Connor v. Covil Corp.*, 996 F.3d 143, 155 (4th Cir. 2021)).) In *Connor*, the decedent did not work directly with any asbestos-containing products but instead was allegedly exposed to asbestos when he interacted with coworkers who were covered in asbestos dust from their own work with asbestos-containing products. *Connor*, 996 F.3d at 149. The Fourth Circuit found that this circumstantial causation evidence was insufficient to show regular exposure to asbestos over an extended period and granted summary judgment to the defendant. *Id.* As a "separate basis" for granting summary judgment, the Fourth Circuit found that decedent's

27

alleged exposure was "dwarfed" by his seven years working directly beside asbestos-containing insulation, which, when replaced, would cover decedent in asbestos dust. *Id.* at 154–55.

The present case is distinguishable from *Connor*. First, as discussed, Plaintiff has offered direct evidence that Walls was exposed to clouds of asbestos dust from his work with Ford trucks on at least a monthly basis for over a decade. This exposure is unlike the hypothetical second-hand exposure analyzed in *Connor* and is more similar to the insulation work that *Connor* found to cause "intense" and "frequent" exposure to asbestos. *Id.* at 155. Second, Ford has not pointed to any single exposure Walls sustained in this case that would "dwarf" his exposure from Ford. Walls worked on a wide variety of asbestos containing products during his long career as a mechanic, and while Ford products represented only a portion of that work, there is no product that so predominates over all other exposures as to "dwarf" Walls' exposure from Ford products. Ford may argue to the jury that Walls' exposure was caused by his early work in the Navy or his work with other asbestos containing products as a mechanic, but these arguments do not entitle Ford to summary judgment.

Finally, Ford argues that it is entitled to summary judgment because Plaintiff cannot prove causation through expert testimony. In separate motions, Ford seeks to exclude such testimony under Rule 702 of the Federal Rules of Evidence and *Daubert*. (ECF Nos. 307, 308, 309.) However, the direct and circumstantial evidence discussed herein—including the general causation expert testimony of DePasquale and Brody to which Strick has not objected—is sufficient on its own to create a genuine issue of material fact as to whether Ford's products were a substantial cause of Plaintiff's mesothelioma. Thus, the Court need

not reach the question presented in Ford's *Daubert* motions to conclude that Plaintiff has presented evidence upon which a reasonable jury could find that Ford's products were a substantial cause of Walls' illness.

Thus, Ford's Motion for Summary Judgment will be denied on Plaintiff's product liability claims.

### 2. Plaintiff has created a genuine issue of material fact of whether a reasonable person aware of the relevant facts would have consumed Ford's asbestos-containing products

Ford next argues that it is entitled to summary judgment on Plaintiff's design defect claim because Plaintiff has not offered an alternative design or shown that no reasonable person would consume asbestos products. (ECF No. 292 at 12 (citing § 99B-6(a)(1)).)

A defective design claim in North Carolina can be supported by showing either (1) "the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design," or (2) "[a]t the time the product left the control of the manufacturer, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." § 99B-6(a). Whether a manufacturer acted unreasonably is a question of fact guided by a non-exclusive list of seven factors, including: (1) the "nature and magnitude of the risks of harm" in light of reasonably foreseeable uses; (2) a users' likely awareness of those risks; (3) conformity of the product to government standards; (4) conformity of pharmaceuticals to applicable standards; (5) utility of the product; (6) feasibility of an alternative design; and (7) foreseeable risks of the alternative design. § 99B-6(b). A plaintiff need not present evidence on all of these factors, but must present "substantial evidence" that the manufacturer acted unreasonably by failing to adopt an alternative design or by

designing a product that no reasonable person would consume. *Smith v. Am. Honda Motor Co.*, No. 1:14-CV-943, 2016 WL 1312541, at *5 (M.D.N.C. Apr. 4, 2016) (citing *DeWitt*, 550 S.E.2d at 519).

Here, Plaintiff argues that asbestos-containing products were "so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." (ECF No. 463 at 22.)  Under the first factor, Plaintiff's evidence supports that removing and replacing asbestos-containing brakes, clutches, and gaskets causes high levels of asbestos exposure, which can cause mesothelioma—a deadly cancer with no known cure. Under the second factor, Ford did not include a warning on its replacement brakes until 1980 and did not warn consumers that its new trucks contained asbestos brakes until 1997, indicating that a reasonable consumer may not have been aware of the risks associated with using the products.  Under the third factor, Plaintiff's evidence supports that cleaning brakes created asbestos concentrations in excess of concentrations considered safe or permitted.  Ford argues that some factors weigh in its favor, including that its brakes had high utility and that there was no feasible alternative design. (*See* ECF Nos. 292 at 12–14, 465 at 5–6.)  This evidence alone, however, does not entitle Ford to summary judgment. Ultimately it is for the jury to weigh the evidence and the relevant factors to determine whether Ford's use of asbestos in its brakes, clutches, and gaskets was reasonable.

Because Plaintiff has created a genuine issue of material fact, Ford's Motion for Summary Judgment on Plaintiff's defective design claim will be denied.

30

3. <u>Plaintiff has created a genuine issue of material fact as to her punitive damages claim</u>

Ford next argues that it is entitled to summary judgment on Plaintiff's claim for punitive damages. (ECF No. 292 at 14–23.) Specifically, Ford argues that (1) punitive damages are barred under Michigan law; (2) alternatively, Plaintiff cannot sustain her punitive damages claims under North Carolina law; and (3) award of punitive damages in this case would be unconstitutional. (*Id.*)

i. *North Carolina law applies to this suit*

Ford first argues that Michigan law, rather than North Carolina law, governs the award of punitive damages in this case. (*Id.* at 14–16.)

A federal court sitting in diversity must apply the substantive law of the forum state, including the form state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). North Carolina courts follow the First Restatement of Conflict of Laws in choice of law analyses of actions sounding in tort. *See SciGrip, Inc. v. Osae*, 838 S.E.2d 334, 344 (N.C. 2020); *Boudreau v. Baughman*, 368 S.E.2d 849, 854 (N.C. 1988). Tort claims are governed by the law of "the state where the injury occurred." *Boudreau*, 368 S.E.2d at 854; *see also* Restatement (First) of Conflict of Laws § 412 (Am. Law Inst. 1934) ("The measure of damages for a tort is determined by the law of the place of wrong."). In toxic chemical cases, the place of injury is the place "where the deleterious substance takes effect and not where it is administered." § 377 n.2.

In contract disputes, including breach of warranty claims in products liability actions, North Carolina's traditional choice of law rules have been supplanted by the Uniform Commercial Code ("UCC"). *Boudreau*, 368 S.E.2d at 854. The UCC applies to transactions

31

in goods, meaning all moveable things. N.C. Gen. Stat. §§ 25-2-102; 25-2-105(1). Where a contract is silent as to choice of law, the UCC requires the application of North Carolina law to "transactions bearing an appropriate relation to this State." § 25-1-301(b). The North Carolina Supreme Court has interpreted this provision to require application of the law of the state with the "most significant relationship" to the cause of action. *Boudreau*, 368 S.E.2d at 855. Under this test, courts consider a number of factors including "the place of sale, distribution, delivery, and use of the product, as well as the place of injury." *Id.* at 855–56. In breach of warranty actions, "the law of the place of distribution should be supreme." *Id.* at 856 ("A state's interest in enforcing warranties involves protection of its citizens from commercial movement of defective goods into that state."); *see also Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 352 n.9 (M.D.N.C. 1995) ("When a personal injury is involved, the place of injury becomes very important, perhaps because the case begins to resemble a tort matter.").

Here, Walls worked in Virginia from 1963 to 1977, (Walls dep. I at 55:23–56:6, 147:24–148:23, 183:7–184:23), and in North Carolina from 1979 to 2002, (*Id.* at 183:15–184:2, 226:7-14). He felt the first symptoms of his ailment while living in North Carolina and was diagnosed with mesothelioma at Duke University. (ECF No. 415-17 at 7–8.) He died at Novant Health Rowan Medical Center in Salisbury, N.C. (ECF No. 246-2.) Thus, the Court finds that the asbestos injured Walls in North Carolina, and North Carolina law controls the award of damages in Plaintiff's actions sounding in tort. Similarly, Ford's products were distributed, delivered, and used in Virginia and North Carolina, and North Carolina was the site of the injury. Thus, the Court finds that North Carolina has the most significant relationship with Plaintiff's breach of warranty claim.

The Court will apply North Carolina's punitive damages law to Plaintiff's claims.

> ii.  <u>Plaintiff's evidence creates a genuine issue of material fact of whether Ford willfully or wantonly distributed asbestos products with knowledge that they could cause illness</u>

In North Carolina, a claim for punitive damages must be proved by clear and convincing evidence.  N.C. Gen. Stat § 1D-15(b).  On summary judgment, a court must view the evidence presented through the "prism" of this heightened evidentiary burden. *Anderson*, 477 U.S. at 254.

Punitive damages may be awarded in North Carolina only if the defendant (1) is liable for compensatory damages and (2) engaged in fraud, malice, or willful or wanton conduct.  N.C. Gen. Stat § 1D-15(a).  "'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm."  § 1D-5(7); *see also Cockerham-Ellerbee v. Town of Jonesville*, 660 S.E.2d 178, 180 (N.C. Ct. App. 2008) ("[A] wanton act is one done with a wicked purpose or . . . done needlessly, manifesting a reckless indifference to the rights of others, and an act is willful when there is a deliberate purpose not to discharge a duty, assumed by contract or imposed by law, necessary for the safety of the person or property of another." (internal quotations omitted)).  "Willful or wanton conduct means more than gross negligence."  § 1D-5(7).  Punitive damages may be awarded against a corporation only if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages."  § 1D-15(c).

Several district courts considering similar suits against manufacturers of asbestos-containing products have found that plaintiffs did not meet the "extremely high standard

33

required under North Carolina law for punitive damages." *Am. Honda*, 2016 WL 1312541, at *3; *see Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 3941978, at *6 (M.D.N.C. Aug. 16, 2018). First, these courts found that a plaintiff must not only show that the defendant had access to articles linking asbestos to illness, but that they "actually understood from these articles that the asbestos included in its brakes was reasonably likely to pose a harm." *Yates v. Air & Liquid Sys. Corp.*, No. 5:12-CV-752-FL, 2014 WL 4923603, at *20 (E.D.N.C. Sept. 30, 2014), *on reconsideration sub nom. Yates v. Ford Motor Co.*, No. 5:12-CV-752-FL, 2015 WL 9222834 (E.D.N.C. Dec. 17, 2015); *see also Lee v. CertainTeed Corp.*, No. 5:13-CV-826-FL, 2015 WL 4526165, at *11 (E.D.N.C. July 27, 2015) (finding that general availability of publications did not "establish a conscious disregard of a known duty"). Second, evidence that a defendant made "broad statements about potential harms under undefined conditions" is insufficient to show that its managers understood the *specific* risk associated with foreseeable use of *specific* products. *Yates*, 2014 WL 4923603, at *20. Third, a plaintiff's evidence must show that defendant knew about the specific risks before plaintiff was exposed, not after. *Id.* Fourth, some effort to warn about the dangers of asbestos—even if insufficient—tends to show "a corporation struggling to understand evolving scientific knowledge about asbestos and mesothelioma" rather than "an active concealment or misrepresentation of facts regarding the dangers of asbestos." *Am. Honda*, 2016 WL 1312541, at *3 (internal quotations omitted).

Here, the evidence taken in the light most favorable to Plaintiff goes beyond the evidence available in the aforementioned cases. Plaintiff has offered evidence that Ford knew that asbestos exposure could have adverse health effects. Generally available publications identified the risks of asbestos starting as early as 1907 and connected asbestos

34

to mesothelioma by 1960. (ECF No. 463-47 at 57:16-21, 106:14-23, 123:14-19.) Ford knew by 1968 that the use of compressed air to clean brakes and clutch assemblies generated measurable asbestos dust, (ECF No. 463-12 at 31:19–34:4, *see generally* ECF No. 463-26), and knew by 1973 that such levels exceeded the maximum allowed by OSHA asbestos regulations, (ECF No. 463-12 at 46:9–47:24, 51:21–53:3; *see generally* ECF Nos. 463-20; 463-52). Ford prohibited its employees in 1973 from cleaning brakes with compressed air because such activity could cause overexposure to asbestos. (ECF No. 463-21.) Nevertheless, Ford failed to warn consumers of these known risks until 1979, no asbestos warnings were included on its brake boxes until 1980, and no warnings against asbestos exposure were given to purchasers of new vehicles until 1996. (ECF Nos. 463-12 at 47:25–48:16, 51:1-9, 57:14–58:13, 61:12-19, 67:2-15, 68:20–69:2, 74:9-13; 463-47 at 33:17-23, 35:4-14, 37:2-9; *see also* ECF No. 463-5 at 17–18.)

This evidence supports that Ford's executives not only had access to generally available publications linking asbestos to illness, but that they understood and acted on these reports by advising their own employees of these dangers and prohibiting the use of compressed air to clean asbestos dust. A reasonable jury could find these acts to be clear and convincing evidence that Ford's management recognized the danger posed by using compressed air to clean its brakes and clutches but failed to share that knowledge with its customers for six years. Unlike in *American Honda* or *Yates*, Walls was working during the interim and could have benefitted from the warning Ford employees received in 1973. Indeed, Plaintiff's experts testify that using compressed air to clean brakes—the exact activity prohibited by Ford in 1973—causes higher levels of asbestos exposure than any other activity Walls engaged in as a fleet mechanic. This and other evidence, when taken in

the light most favorable to Plaintiff, is sufficient to create a genuine issue of material fact as to her claim for punitive damages.

<i>iii.</i>        <i>Awarding punitive damages would not be unconstitutional</i>

Finally, Ford argues that awarding punitive damages in this case would render North Carolina's punitive damages award unconstitutionally vague. (ECF No. 292 at 21–23.)

The Constitution guarantees "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). "[D]ue process embraces a rule of law which contains standards that can be known in advance, conformed to, and applied rationally." *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 101 (4th Cir. 1991). While the "strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases," the Supreme Court has held that "the basic protection against judgments without notice afforded by the Due Process Clause is implicated by civil *penalties*." *BMW*, 517 U.S. at 574 n.22 (internal citation and quotations omitted).

Nevertheless, the Court has consistently held that "the common-law method for assessing punitive damages does not in itself violate due process." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17 (1991). While a "grossly excessive" award may violate due process, an award of punitive damages is not categorically considered "unconstitutionally vague" as long as "prior law fairly indicated that a punitive damages award might be imposed in response to egregiously tortious conduct." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462, 465–66 (1993).

Here, there is no question that North Carolina's prior law, discussed above, fairly indicated that a defendant can be held liable for punitive damages if it engaged in willful or

36

wanton tortious conduct. Ford argues that its conduct was not sufficiently egregious to justify award of punitive damages in this case and, therefore, any award of punitive damages would render North Carolina law unconstitutionally vague. This argument merely rephrases Ford's argument, rejected above, that its conduct was not willful or wanton as a matter of law. As discussed, the evidence taken in the light most favorable to Plaintiff supports that Ford knowingly withheld information from its consumers about the sizeable health risks associated with a specific, foreseeable method of cleaning its products for seven years. If the jury finds by clear and convincing evidence that Ford engaged in this conduct, it may award punitive damages, and such an award would not render North Carolina's law unconstitutionally vague.

Thus, Ford's Motion for Summary Judgment on Plaintiff's claim for punitive damages will be denied.

4.    Plaintiff's loss of consortium claim is encompassed by her wrongful death claim and can be dismissed

Finally, Ford moves for summary judgment on Plaintiff's claim for loss of consortium. (ECF No. 292 at 2 n.1.) Plaintiff filed her loss of consortium claim while her husband was still alive; now that he has passed, this claim is encompassed by her wrongful death claim and can be dismissed. *See Keys*, 435 S.E.2d at 822. Thus, Ford is entitled to summary judgment on Plaintiff's claim for loss of consortium, and the Court will grant Ford's motion as to this claim.

37

## G.    Defendant Navistar, Inc.'s Motion, (ECF No. 326)

### 1.    Plaintiff has created a genuine issue of material fact as to whether Navistar caused Walls' illness

Navistar first argues that it is entitled to summary judgment on Plaintiff's product liability claims because Plaintiff has failed to create a genuine issue of material fact as to whether Walls' illness was caused by his exposure to its products.  (ECF No. 327 at 10–11.)

Navistar is successor in interest to International Truck and Engine Corporation ("International"), a truck manufacturer.  (ECF Nos. 138 ¶ 31; 327 at 2 n.1.)  Walls performed maintenance on International trucks while at Adley from 1977 to 2002.  (Walls dep. III at 32:6-15, 55:12-15; *see* Walls dep. II at 15:12-17.)  In 1977 and 1978, he performed roughly 50–60 brake jobs, 40–60 clutch jobs, and 50–75 gasket jobs each year—one-sixth of which were on International trucks.  (Walls dep. I at 211:23–212:12, 222:14-23, Walls dep. II at 15:18–16:1.)  From 1979 to 2002, he performed approximately 100–120 brake jobs, 40–50 clutch jobs, and 120 gasket jobs each year.  (Walls dep. I at 232:18–233:4, 245:18–246:1, 251:14-24; Walls dep. II at 16:7-18, 23:14-23.)  Again, roughly one-sixth of these were on International trucks.  (Walls dep. at 211:23–212:12.)

When Walls worked on International trucks, he exclusively installed brakes and clutches supplied by International, and the brakes and clutches he removed were supplied by International "99 percent of the time."  (Walls dep. I at 195:8–196:1; Walls dep. II at 198:25–199:12; Walls dep. III at 23:17-24, 61:2–62:1).  Walls used gaskets supplied by the third-party manufacturer of International's engines.  (Walls dep. I at 101:7-12, 106:21–107:15.)  These brakes, clutches, and gaskets contained asbestos until the 1980s.  (ECF No. 419-5 at 51:19-25, 54:20-25.)  International phased asbestos out of its brake drums in new

38

models in 1983 or 1984. (*Id.* at 51:19-25; *see* ECF No. 419-7 at 58:9-13, 60:2-5.) International clutches contained asbestos until 1980. (ECF No. 419-5 at 54:20-25.) International engine gaskets contained asbestos until 1988. (ECF Nos. 419-23 at 158:14–159:21; 419-24; 419-25 at 52:3–53:14.)

A reasonable jury could conclude from this evidence that Walls' exposure to asbestos from International's products constituted a substantial cause of his mesothelioma. Walls' estimate that one-sixth of his work was on International trucks means that, according to this testimony, he performed about ten brake, clutch, and gasket jobs on Internationals in 1977 and again in 1978. From 1979 on, Walls performed nearly twenty brake jobs, seven or eight clutch jobs, and seventeen gasket jobs on Internationals each year. Each job created clouds of dust which Walls inhaled. Until International phased asbestos out of its clutches in 1980, brakes in 1983 or 1984, and gaskets in 1988, each maintenance job subjected Walls to "significant airborne asbestos exposures," and he continued to be exposed after these dates as he removed old parts and replaced them with new, non-asbestos parts. According to Plaintiff's expert and scientific evidence, these activities expose mechanics to high asbestos concentrations in excess of concentrations considered safe or permissible. Viewing the evidence in the light most favorable to Plaintiff and resolving all inferences in her favor, a reasonable jury could find that Walls experienced direct and regular exposure to asbestos from International brake linings over an extended period.

Navistar is not entitled to summary judgment on this ground.

2.    International was a "manufacturer" under North Carolina law

Navistar next argues that International obtained all its asbestos-containing parts from third-party manufacturers and, therefore, cannot be held liable as a "manufacturer" of asbestos products under North Carolina law.  (ECF No. 327 at 11–15.)

Under North Carolina law, a manufacturer is one "who designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product prior to its sale to a user or consumer."  N.C. Gen. Stat. § 99B-1(2).  A manufacturer has a duty to inspect or test its products, "which includes [the] duty to inspect products manufactured by another which are component parts of the product produced by the manufacturer."  *Red Hill Hosiery Mill*, 530 S.E.2d at 326.  "[A] manufacturer who incorporates a defective component part into its finished product and then places the finished product into the stream of commerce is liable for injuries caused by a defect in the component part."  *Harris*, 2014 WL 3101941, at *6 (citing *Baughman*, 780 F.2d at 1132).  "The fact that the manufacturer or assembler did not actually manufacture the component part is irrelevant."  *Baughman*, 780 F.2d at 1132 (applying South Carolina law).  Instead, "the plaintiff must be able to show that the defendant sold or exercised control over the defective product."  *Id.*

Here, International designed, assembled, and produced tractor-trailer trucks. International included in this design brakes, clutches, and gaskets containing asbestos. Further, Walls testified that he obtained all replacement brakes and clutches from International.  Based on this evidence, a reasonable jury could find that International sold or exercised control over these asbestos-containing products.  Thus, the fact that International did not actually manufacture the brakes or clutches itself is "irrelevant."

40

Taking the evidence in the light most favorable to Plaintiff supports that International is a "manufacturer" under North Carolina law and may be liable for defects in those constituent parts.

Navistar's Motion for Summary Judgment will be denied as to Plaintiff's product liability claims.

           3.    <u>Plaintiff's evidence is insufficient to support her claim for punitive damages</u>

Navistar next argues that it is entitled to summary judgment on Plaintiff's claim for punitive damages. (ECF No. 327 at 17–18.)

North Carolina's requirements for punitive damages are stated in full in Section IV.F.3.iii, *supra*. Punitive damages may be awarded only if the plaintiff shows by clear and convincing evidence that a defendant engaged in willful or wanton conduct. § 1D-15(a), (b). "Willful or wanton conduct" is more than gross negligence and requires a "conscious and intentional disregard of and indifference to the rights and safety of others." § 1D-5(7); *Cockerham-Ellerbee*, 660 S.E.2d at 180. Punitive damages may be awarded against a corporation only if "the officers, directors, or managers of the corporation participated in or condoned" the willful or wanton conduct. § 1D-15(c) (2003). Courts have found the general availability of publications broadly linking asbestos to cancer, without evidence of indifference to a specific risk, to be insufficient evidence of willful or wanton conduct under the "extremely high standard required under North Carolina law for punitive damages." *Am. Honda*, 2016 WL 1312541, at *3; *see Finch*, 2018 WL 3941978, at *6; *Yates*, 2014 WL 4923603, at *20; *Lee*, 2015 WL 4526165, at *11.

Here, Plaintiff has offered some evidence that Navistar and International knew about the health hazards of asbestos prior to Walls' exposure. As early as the 1930s, International executives attended a conference and were part of a committee that discussed asbestos health effects, and its employees received articles warning of the dangers of asbestos dust exposures. (ECF No. 419-5 at 147:3-6, 149:23–150:5, 151:11-19, 154:21–155:7, 156:6-13, 160:9-21, 161:11–162:24, 168:25–172:6, 172:14–178:2.) OSHA was formed in 1971, and in 1972 required manufacturers to provide warnings on asbestos products where "reasonably foreseeable use" could lead to excessive concentrations of airborne asbestos. *See* Standard for Exposure to Asbestos Dust, 37 Fed. Reg. 11318, 11321 (June 7, 1972) (codified at 29 C.F.R. 1910.93a(g)). Nevertheless, International and Navistar continued to sell products containing asbestos without warning until the 1980s, and never warned about the danger of asbestos exposure from removing gaskets from engines. (ECF No. 419-5 at 74:19–75:17, 107:17–108:3, 110:7-15, 222:10-18, 223:2-14, 232:10-18.) Navistar continued to use asbestos gaskets all the way into 1991, after many other manufacturers had stopped using asbestos gaskets. (ECF No. 419-27 at 52:10-14 (stating that Navistar was the last customer of a gasket manufacturer to purchase gaskets containing asbestos)).

Nevertheless, this evidence is insufficient to allow a reasonable jury to find willful or wanton conduct by clear and convincing evidence. At most, the evidence presented by Plaintiff supports that International had access to general information that linked asbestos to illness; however, no evidence supports that International officers, directors, or managers read those warnings or specifically understood that foreseeable use of its brakes, clutches, and gaskets could cause unsafe exposures. This case is not meaningfully different than

42

those cited above which dismissed claims for punitive damages that were based on limited evidence that a company's directors had access to information generally linking asbestos exposure to illness, but where plaintiff had no evidence that corporate officers actually understood the specific risk posed by their products.

Thus, Navistar's Motion for Summary Judgment on Plaintiff's punitive damages claim will be granted.

For the reasons stated herein, the court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant ZF's Motion for Summary Judgment, (ECF No. 249), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's claim for punitive damages against Defendant ZF. It is DENIED as to Plaintiff's remaining claims against Defendant ZF.

**IT IS FURTHER ORDERED** that Defendant Carlisle's Motion for Summary Judgment, (ECF No. 295), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's claim for punitive damages against Defendant Carlisle. It is DENIED as to Plaintiff's remaining claims against Defendant Carlisle.

**IT IS FURTHER ORDERED** that Defendant Strick's Motion for Summary Judgment, (ECF No. 247), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's claims for loss of consortium and punitive damages against Defendant Strick. It is DENIED as to Plaintiff's remaining claims against Defendant Strick.

**IT IS FURTHER ORDERED** that Defendant Abex's Motion for Summary Judgment, (ECF No. 293), is DENIED.

**IT IS FURTHER ORDERED** that Defendant ArvinMeritor's Motion for Summary Judgment, (ECF No. 271), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's claim for punitive damages against Defendant ArvinMeritor. It is DENIED as to Plaintiff's remaining claims against Defendant ArvinMeritor.

**IT IS FURTHER ORDERED** that Defendant Ford's Motion for Summary Judgment, (ECF No. 291), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's claim for loss of consortium against Defendant Ford. It is DENIED as to Plaintiff's remaining claims against Defendant Ford.

**IT IS FURTHER ORDERED** that Defendant Navistar's Motion for Summary Judgment, (ECF No. 326), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's claim for punitive damages against Defendant Navistar. It is DENIED as to Plaintiff's remaining claims against Defendant Navistar.

This, the 25th day of February 2022.

/s/ Loretta C. Biggs
United States District Judge